UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON

THOMAS WEINSTEIN,

Plaintiffs,

vs.

MANDARICH LAW GROUP, LLP.

Defendant.

NO. 2:17-cv-01897-RSM

**DECLARATION OF JASON D. ANDERSON IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT**

Jason D. Anderson declares as follows:

1. I am one of the attorneys for Plaintiffs in this matter, am over the age of majority, and make this declaration of my own personal knowledge.
2. Attached hereto as **Exhibit A** is a true and correct copy of the October 2015 Motion and Declaration for Default and Default Judgment, and subsequent Order of Default and Default Judgment as obtained from the King County Superior Court Clerk's office.
3. Attached hereto as **Exhibit B** is a true and correct copy of Defendant Mandarich Law Group, LLP's Rule 30(b)(6) deposition, taken on May 25, 2018.

//

**ANDERSON | SANTIAGO**
787 MAYNARD AVE S
SEATTLE WA 98104
(206) 395-2665/F (206) 395-2719

4. Attached hereto as **Exhibit C** is a true and correct copy of an excerpt from Defendant Mandarich Law Group, LLP's responses to Plaintiff's requests for admission.

I DECLARE UNDER PENALTY OF PERJURY UNDER THE LAWS OF THE UNITED STATES AND THE STATE OF WASHINGTON THAT THE FOREGOING IS TRUE AND CORRECT.

DATED this 5th day of July, 2018 at Seattle, Washington.

/s/ Jason D. Anderson
Jason D. Anderson

**ANDERSON | SANTIAGO**
787 MAYNARD AVE S
SEATTLE WA 98104
(206) 395-2665/F (206) 395-2719

# EXHIBIT A

FILED

15 OCT 13 AM 8:48

KING COUNTY
SUPERIOR COURT CLERK
KENT, WA

**SUPERIOR COURT, IN AND FOR THE COUNTY KING**
**STATE OF WASHINGTON**

| | |
|---|---|
| CACH, LLC,<br>Plaintiff,<br>vs.<br>THOMAS WEINSTEIN and DOE WEINSTEIN,<br>Defendants. | Case No.: 15-2-24463-9<br><br>**MOTION AND DECLARATION FOR DEFAULT AND DEFAULT JUDGMENT** |

## I. MOTION

Plaintiff, by and through its attorneys of record, moves the court for an order of default and default judgment against the Defendants, THOMAS WEINSTEIN and DOE WEINSTEIN, in the principal sum of $3028.05, together with applicable interest up to January 21, 2013, court costs and statutory attorney's fees, as requested in the judgment.

This motion is based on the affidavits or declarations in support of entry of judgment submitted herewith and the subjoined declaration of counsel.

## II. DECLARATION

Plaintiff, by and through its attorneys of record, moves the court for an order of default and default judgment against the Defendants, THOMAS WEINSTEIN and DOE WEINSTEIN, in the principal sum of $3028.05, together with applicable interest, court costs and statutory attorney's fees, as requested in the judgment.

MANDARICH LAW GROUP, LLP
9200 Oakdale AvenueSuite 601
Chatsworth, CA 91311
T: 855.826.8349: F: 818.888.1260

The undersigned declares under penalty of perjury under the laws of Washington that the following is true and correct:

1. I am the attorney of record for Plaintiff herein. I base this declaration on my review of the file maintained by this law firm with regard to this matter.

2. The Defendants were served with the Summons, Notice to Service Members and their Dependents and the Complaint by personal or substitute service within Washington State. The affidavit/declaration of service is on file with the court.

3. Defendants have failed to file an appearance/answer or otherwise defend, in accordance with CR 55, within the time permitted by law.

4. The basis for venue is that the Defendants reside within KING county.

5. Defendant is not a person in the Military Service of the United States, as defined in the Soldier's and Sailor's Civil Relief Act of 1940 as amended by The Service Members Civil Relief Act of 2003. (*See attached Status Report Pursuant to Servicemembers Civil Relief Act*). Moreover, Affiant is unable to determine at this time if Defendants are a dependent of a service member in military service; however, Plaintiff served upon Defendants a Notice to Service Members and their Dependents and Plaintiff did not receive a response.

I declare under penalty of perjury of the laws of the State of Washington that the foregoing is true and correct.

DATED: 10/08/2015 at Los Angeles, California.

Ryan E. Vos, WSBA 30392
Attorneys for Plaintiff

**MANDARICH LAW GROUP, LLP**
9200 Oakdale AvenueSuite 601
Chatsworth, CA 91311
T: 855.826.8349: F: 818.888.1260

15-2-24463-9, KNT

FILED

2015 OCT 13 PM 12: 02

KING COUNTY
SUPERIOR COURT CLERK
KENT, WA

**SUPERIOR COURT, IN AND FOR THE COUNTY KING
STATE OF WASHINGTON**

| | |
|---|---|
| CACH, LLC,<br>Plaintiff,<br>vs.<br>THOMAS WEINSTEIN and DOE WEINSTEIN,<br>Defendants. | Case No.: 15-2-24463-9<br><br>**ORDER OF DEFAULT AND DEFAULT JUDGMENT** |

## I. JUDGMENT SUMMARY

Judgment Creditor: CACH, LLC

Attorney for Judgment Creditor: Ryan E. Vos, Esq., Mandarich Law Group, LLP

Judgment Debtors: THOMAS WEINSTEIN and DOE WEINSTEIN

| | | |
|---|---|---|
| Principal Amount: | | $3028.05 |
| Prejudgment Interest at 12% from / / to 1/21/2013 | $0.00 | |
| Costs: | | |
| Filing Fee: | | $240.00 |
| Service of Process: | | $60.00 |
| Ex-Parte: | | $30.00 |
| Statutory Attorney's Fees: | | $200 |
| Credit(s): | | *$0.00* |
| TOTAL: | | $3558.05 |

**MANDARICH LAW GROUP, LLP**
9200 Oakdale AvenueSuite 601
Chatsworth, CA 91311
T: 855.826.8349: F: 818.888.1260

## II. ORDER AND JUDGMENT

Plaintiff's motion for an order of default and default judgment against the above named defendants came on for hearing on this date before the undersigned judge/court commissioner of this court. The court, having found that: (1) the Defendants were duly served with a Summons, Notice to Service Members and their Dependents and the Complaint and have failed to appear, answer, or otherwise defend within the time provided by law; (2) finds that the venue is proper; and (3) the defendants are justly indebted to the plaintiff, as evidenced by the proof presented herewith, now, therefore, it is hereby

ORDERED, ADJUDGED and DECREED that the Defendants are in default. It is further

ORDERED, ADJUDGED and DECREED that Plaintiff have and is hereby granted judgment against Defendants, THOMAS WEINSTEIN and DOE WEINSTEIN, jointly and severally, in the principal amount of $3028.05 plus pre-judgment interest from / / to 1/21/2013 in the amount of $0.00 herewith court costs totaling $330.00 and applicable statutory attorney's fees in the amount of $200, for a total judgment of $3558.05 having applied all applicable credits. Post-judgment interest shall accrue at the statutory rate of 12% per annum on the total judgment.

DATED this 13 day of Oct 2015.

JUDGE/COURT COMMISSIONER
Julia Garratt

Presented by:
MANDARICH LAW GROUP, LLP

Ryan E. Vos, WSBA 30392
Attorneys for Plaintiff

MANDARICH LAW GROUP, LLP
9200 Oakdale AvenueSuite 601
Chatsworth, CA 91311
T: 855.826.8349: F: 818.888.1260

# EXHIBIT B

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON AT SEATTLE

---

THOMAS WEINSTEIN, )
Plaintiff, )
vs. ) No. 2:17-cv-01897-RSM
MANDARICH LAW GROUP, LLP, )
Defendant. )

---

30(b)(6) DEPOSITION UPON ORAL EXAMINATION OF

MANDARICH LAW GROUP, LLP

DESIGNEE: RYAN EARL VOS

---

11:30 a.m.

May 25, 2018

787 Maynard Avenue South

Seattle, Washington

REPORTED BY: Brenda Steinman, CCR #2717

Court Reporter

A P P E A R A N C E S

FOR THE PLAINTIFF:
T. TYLER SANTIAGO, ESQ.
Anderson Santiago, PLLC
787 Maynard Avenue South, Suite 201
Seattle, Washington 98104
206.395.2665
tyler@alkc.net

FOR THE DEFENDANT:
NICOLE M. STRICKLER, ESQ.
Messer Strickler, Ltd.
225 West Washington Street, Suite 575
Chicago, Illinois 60606
312.334.3442
nstrickler@messerstrickler.com

****** (* Denotes Phonetic Spelling.)

E X A M I N A T I O N

| ATTORNEY | PAGE |
|---|---|
| BY MR. SANTIAGO: | 5 |

E X H I B I T I N D E X

| EX# | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | 4/18/2018 Notice of 30(b)(6) Deposition of Mandarich Law Group, LLP. | 5 |
| Exhibit 2 | 9/9/2014 Summons and Complaint; CACH v Weinstein. | 28 |
| Exhibit 3 | 9/19/2014 Declaration of Service of Summons; Complaint; CACH v. Weinstein. | 30 |
| Exhibit 4 | 10/6/2014 letter from Mandarich to Weinstein, Re: Authorization for recurring payments. Undated letter from Mandarich to Weinstein. 1/15/2017 letter from Mandarich to Weinstein. | 37 |
| Exhibit 5 | 3/2/2018 Defendant Mandarich Law Group, LLP's Responses to Plaintiff's First Set of Interrogatories; Weinstein v. Mandarich. | 51 |
| Exhibit 6 | 8/2/2014, undated, undated, 3/14/2016, 4/14/2016, 7/14/2016, 8/14/2016, 9/14/2016, 12/15/2016, 1/15/2017, 2/15/2017 letters from Mandarich to Weinstein. | 60 |
| Exhibit 7 | 9/30/2015 Complaint; CACH v Weinstein. | 67 |
| Exhibit 8 | 10/5/2015 Order Setting Civil Case Schedule; CACH v Weinstein. | 81 |

E X H I B I T I N D E X (Cont.)

| EX# | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 9 | 4/2/2018 Plaintiff's Responses to Defendant's First Requests for Admission; Weinstein v. Mandarich. | 84 |
| Exhibit 10 | 10/8/2015 Motion and Declaration for Default and Default Judgment. 10/13/2015 Order of Default and Default Judgment; CACH v Weinstein. | 91 |
| Exhibit 11 | 4/14/2017 Writ of Garnishment for Continuing Lien on Earnings. | 99 |
| Exhibit 12 | 10/11/2017 Writ of Garnishment for Continuing Lien on Earnings. | 101 |
| Exhibit 13 | 1/11/2018 Amended Affirmative Defenses. | 102 |
| Exhibit 14 | Complaint for Violations of 15 U.S.C. 1692 Et Seq. and RCW Chapters 19.16 and 19.86 Et Seq. | 107 |

SEATTLE, WASHINGTON; FRIDAY, MAY 25, 2018
11:30 A.M.
oo-OO-oo

RYAN VOS, called as a witness in the above-entitled cause, being first duly sworn, testified as follows:

E X A M I N A T I O N

BY MR. SANTIAGO:
Q. Would you please state your full name and spell your last name for the record?
A. Ryan Earl Vos. V like Victor O-S like Sam.
Q. We're here today on Thomas Weinstein v. Mandarich Law Group, U.S. District Court Western District of Washington Case No. 2:17-cv-01897.
So you're here as a representative of Mandarich Law Group today; is that correct?
A. Yes.
(Exhibit 1 marked for identification.)
Q. (By Mr. Santiago) I'm showing you what's been marked as Exhibit 1.
MR. SANTIAGO: Nicole, this is the notice of deposition. I think I sent it to you yesterday.
MS. STRICKLER: Okay. Let me just pull it up real fast. I've got it. Thank you.

Page 6

Q. (By Mr. Santiago) Did you have time to review this prior to coming here today?
A. Yes.
Q. And are you prepared to testify on the topics outlined in the notice?
A. Generally speaking I am.
Q. Did you prepare for today's deposition?
A. Yes.
Q. How did you prepare?
A. I went through my legal file.
Q. How long did you spend preparing?
A. I'm not sure exactly, maybe an hour.
Q. Have you been deposed before?
A. Yes.
Q. How many times would you say?
A. Maybe half dozen.
Q. Dozen?
A. Half dozen.
Q. Okay. Is it in relation to your employment with Mandarich?
A. A few times, yes.
Q. How many times?
A. I don't know exactly. Most of them. I think I've been deposed outside of Mandarich for separate items, but roughly about half dozen times

Page 7

total.
Q. So I'm going to go over this sort of list. I know you're an attorney, and you probably already know this, but I forget too, so just sort of a list of, not rules, but things we should probably follow.
A. Okay.
Q. First, you know the court reporter is trying to transcribe everything we say. In normal conversation people tend to talk over each other, just to sort of -- I guess it's a sort of social thing. In any case, if you can wait until I'm done asking the question before you answer -- okay, you get it.
So head nods and uh-huhs probably don't work, so if you could clearly state yes or no to questions.
Is there any reason; like stress, or any medications, or anything that would keep you from testifying truthfully today?
A. No.
Q. Ask me to repeat a question if you don't understand it.
Do you have any questions now?
A. I do not.
Q. So I'm going to ask you a little bit about your background first.

Page 8

You're an attorney, so where did you go to school?
A. I went to Whittier Law School.
Q. Where is that?
A. Los Angeles.
Q. Where did you go to school before that?
A. UNLV.
Q. And that's Nevada?
A. Mm-hmm. That's Las Vegas.
Q. When did you graduate from law school?
A. 2000.
Q. How long have you been working for Mandarich?
A. Since 2010.
Q. What did you do before you worked for Mandarich?
A. Immediately before?
Q. Yes.
A. I was an executive director of a courier and attorney service.
Q. And what was that called?
A. Time Machine Network.
Q. What did you do there?
A. I was the executive director. I ran the company.

Page 9

Q. What did that company do exactly?
A. Do you use attorney service?
Q. Yeah.
A. That's it. They were an attorney service, courier service. It was -- ABC Legal.
Q. Got it.
A. I'm sure you're familiar with them.
Q. Yeah. What did you do before that?
A. Before that I was managing director of California office for Wolpoff & Abramson, a debt collection law firm.
Q. How long were you there?
A. I believe two years.
Q. And what does the managing director do at Woldoff & Abramson?
A. It's Wolpoff, with a P.
Q. Wolpoff, I'm sorry.
A. It's W-O-L-P-O-F-F. I always get that question. It's really a weird name.
Similar to what I do now. It's a little different. But we were a satellite office of Wolpoff & Abramson in California. So Wolpoff & Abramson had several operations throughout the country, and their main operation was in D.C.
I ran the California operation, which

Page 10

focused on California lawsuits at the time. So it was a division of 25 to 30 people. And I was responsible for that part of the operation.
Q. And you were an attorney at that time?
A. Yes.
Q. What did you do before you worked for Wolpoff & Abramson?
A. I've been an attorney since, I think I barred in Washington State originally in 2000, barred in 2000 in Washington State. I practiced up here for a couple of years.
And then moved to California, took the bar out there. And then practiced there sole practitioner until I ended up with Wolpoff.
Q. So speaking of bar licenses, what states do you have a license in?
A. Washington, California, Oregon, Idaho, and Alaska.
Q. Let's talk about what you do at Mandarich now. What is your official title or position there?
A. A managing attorney.
Q. What does a managing attorney do there?
A. I have a lot of different duties. I am responsible for consulting with all of our associates. I work hand in hand with the operational team, hand in

Page 11

hand with the collection team, collection agents. I work with the compliance department. I work with IT. It's just kind of a large range.
Q. So of all these different departments, which one do you oversee?
A. I oversee the associate attorneys and the of counsel for the west coast.
We have two physical locations. So the second physical location is in Chicago, and we have attorneys and of counsels based out of Chicago that I work with, but I do not oversee.
Q. You said there is two offices?
A. Mm-hmm. Yes.
Q. First office is where?
A. In Los Angeles.
Q. How many associates do you oversee?
A. Let me think. I believe five associates at the time. It fluctuates based on need.
Q. And you mentioned there are attorneys that are of counsel?
A. Yes.
Q. And you oversee them?
A. Yes.
Q. How many are there?
A. I believe it's either three or four. And

Page 12

that's for the west coast.
Q. And you probably already said this, but you have an active Washington license right now?
A. I do.
Q. Are there any other attorneys at Mandarich right now that have an active Washington license?
A. No.
Q. So other than overseeing all these departments and these attorneys --
A. Just to be clear -- I'm sorry.
Q. Go ahead.
A. I oversee the attorneys. I work in conjunction with the other departments, I do not oversee them.
Q. Sorry, I misstated.
A. No problem.
Q. So other than overseeing these attorneys, what else do you do for Mandarich?
A. Similar to what I stated earlier. I work with other departments to make sure that the law firm is functioning as needed.
Q. Do you file any lawsuits for Mandarich?
A. Can you tell me what you mean by do I file any lawsuits?
Q. Are you the attorney of record for lawsuits

Page 13

filed by Mandarich?
A. Yes.
Q. And where does that occur?
A. It would occur in -- well --
Q. What state are the lawsuits filed in? Sorry, that was a bad question.
A. My -- I am an attorney of record in the states that I'm barred. I also share being attorney of record in some of those states as well, because we may have other attorneys that are barred also.
Q. So is it fair to say in Washington you're the only attorney that is the attorney of record for cases filed by Mandarich?
A. Currently, yes. We used to have another attorney that worked with us that was barred, so I'm not the only attorney on all files, but I am now going forward.
Q. Who was that attorney?
A. Mat LaCroix.
Q. And why is he no longer the other attorney on those cases?
A. He took a position maybe at the bankruptcy court, I believe, but I can't remember.
Q. So tell me about Mandarich Law Group.
A. What would you like to know?

Page 14

Q. What areas of law do they practice?
A. Civil litigation.
Q. Do they have a focus?
A. I mean if you're trying to allude to are we like debt collection; sure.
Q. Do they do anything other than debt collection?
A. No.
Q. You sort of went through some of the states that you file cases in on behalf of Mandarich. Would it be faster to list the states that they do or don't practice in?
A. I can list the states that they do.
Q. Okay.
A. So overall is what you're saying.
Q. Yes.
A. And you're saying, generally speaking, whether we have of counsel or associates.
Q. Just whether Mandarich files cases in the state or not, yes.
A. Okay. So the five that I had listed. I'll add Nevada and Hawaii for the west coast. And then Illinois, Kansas, Nebraska, Iowa, Missouri, Utah, and Virginia.
Q. How long has Mandarich been in business?

Page 15

A. 2010.
Q. Do you know how many cases Mandarich files in Washington?
A. I don't.
Q. Do you have a guess or an estimate?
A. I really don't.
Q. Does Mandarich still file lawsuits in Washington?
A. Yes.
Q. So how is Mandarich structured? So you're managing attorney. I guess if you could say who's above you, who's above that person, et cetera.
A. So I mean there is -- Chris Mandarich is the owner --
Q. Makes sense.
A. -- and partner. So then we have multiple different departments that I had mentioned; the collection department, compliance department, an operational department, we have an HR department, and then IT. Pretty sure that sums it up.
Q. Who is the other partner or partners?
A. Michael Mandarich.
Q. I assume they're related?
A. Yeah.
Q. So who's directly below the partners?

Page 16

A. Directly below?
Q. In terms of like the management structure.
A. Myself, and then generally all of the heads of the departments that I had mentioned to you.
There is also an accounting, I left that out. There is an accounting.
Q. How many employees does Mandarich have?
A. I don't know that number off the top of my head.
Q. So tell me about the collection department, how is that structured?
A. There is a floor manager and collectors.
Q. How many collectors are there?
A. I'm not sure of that number either.
Q. And the compliance department?
A. The compliance is made up of a trainer and director of compliance. And then they have some people that work under them, but I'm not sure exactly how many work under them.
Q. What does the collection department do?
A. Generally they'll make outbound calls and field inbound calls for purposes of making collections on files.
Q. Any other things that they do?
A. Not generally. That's really the main

Page 17

focus. I mean what might happen with a call either way would determine what would happen with it. But generally their focus is to collect on those files, taking inbounds and making outbounds.
Q. What does the compliance department do?
A. They're responsible for training and helping implement and oversee compliance for the firm.
Q. Compliance with what?
A. Compliance with federal and state regs. Anything that might fall underneath a compliance. I guess I don't really know how else to say it. I think compliance speaks for itself for the most part.
Q. How do they train and who are they training -- sorry, strike that. That's two questions.
Who is the compliance department training?
A. They'll train anybody in the firm, depending upon the policy, or procedure, or statute, or wherever it might be applicable. There will be a determination of who needs to understand that piece of the training, and then those individuals would be brought in for that training.
Q. Do they train the collection department?
A. That would be one of the groups. They would train anybody that would be in part of the company.
Q. Do you know how they train the collection

Page 18

department?
A. It depends on what is being trained. It can be anywhere from passing out a procedure to read and review and sign off on versus conference room like this with a Powerpoint presentation. There is a bunch of different ways that they could train.
Q. Does the compliance department interact with the attorneys in the office?
A. Yes.
Q. For what purpose?
A. For training purposes. For getting up to speed on regulations and statutes and what have you. They don't work independently as it relates to the training procedures. They might facilitate, but they are consulted with.
Q. They're consulted with by who?
A. They're consulted by.
Q. Consulted by?
A. Attorneys, ownership, whomever might be a subject matter expert.
Q. So the compliance department, in order to put together its training materials, consults with attorneys in your office. Is that a fair statement?
A. On occasion.
Q. Where does the compliance department get its

Page 19

information for its training materials?
A. I mean that's kind of a loaded question. I just mentioned earlier that they train everything and anything. So depending upon what it is, where it's coming from, whether it's from a statute or a client, it just depends.
Q. Let's talk about debt collection statutes, for example. Does the compliance department do training and compliance organizing on the Fair Debt Collection Practices Act?
A. Yes, they would.
Q. And where do they get their information in order to do that?
A. They would use federal statute and consult with attorneys in the firm, and possibly external attorneys as well.
Q. Are there any attorneys that are specifically assigned to the compliance department?
A. Generally, no.
Q. Does the compliance department need to get attorney approval before training anyone on the Fair Debt Collection Practices Act in the office?
A. For Fair Debt Collection Practices Act?
Q. Yes.
A. They would run it by an attorney to make a

Page 20

determination, yeah.
But as long as -- if nothing has changed, then they would train off the same information. Like for example, we require our collectors to take a FDCPA exam once a year. If nothing has changed, then they might take an exam that they have taken previously.
Q. So let's talk about the FDCPA exam. What is it exactly?
A. It's an exam of questions.
Q. What's the purpose?
A. So that the collectors can understand the FDCPA.
Q. So the test helps them to understand the FDCPA?
A. Well, the test questions their knowledge regarding some of the items in the FDCPA.
Q. So does Mandarich provide something to prepare them to take the test?
A. Yes. Information regarding the FDCPA, the statute.
Q. Is that information written down?
A. Yes.
Q. Is that something that exists in Mandarich's office?
A. I'm not sure where it exists. I don't

Page 21

control it. I'm not sure where it exists.
Q. I guess what I'm asking is, is it something that we could obtain through discovery?
A. It's possible. Again, I don't know where it exists, so I'm not 100 percent sure.
Q. Do specific collectors in the collection department, are they assigned to specific states?
A. The way that the collectors work changes a lot, so I really don't know if they are at this time. That's something more for our collection staff, not necessarily something that I oversee. But state-wise I don't believe so at this time. That could change and I could be wrong.
Q. Do the collectors receive any state specific training on state collection laws?
A. Yes.
Q. So you mentioned that the collectors are not assigned to specific states. Are they then each taught how to comply with the laws in every state that Mandarich is licensed to file lawsuits?
A. If they're touching files that would span across those states, then yes.
Q. Are there records of this training?
A. Which training?
Q. Training on the state debt collection laws.

Page 22

A. We have training records for whatever gets trained.
Q. And the training records are, are they records of the individual collector having gone through the training?
A. I believe so.
Q. And those records exist for FDCPA training as well?
A. Any training.
Q. So you oversee some associates in the office?
A. Mm-hmm.
Q. Do they have staff?
A. No, they don't.
Q. So who produces the documents that you would file in court, like for example a complaint?
A. So we have some people that work on the operations team, they might produce documents. The attorneys might produce documents. It depends on what documents are being produced. But there is -- there are staff in the operations team that will produce documentation, legal documentation. They're generated from templates.
Q. So generally speaking, the operations team generates documents that are filed in the court.

Page 23

A. Generally.
Q. So how about complaints?
A. Yes.
Q. Motions for default judgment?
A. Yes.
Q. Writs of garnishment?
A. Yes.
Q. And just to be clear, those are all generated by the operations team?
A. Yes.
Q. What prompts the operations team to generate a complaint?
A. Our software program.
Q. What's the name of the software program?
A. JST.
Q. Is that an acronym for something?
A. Oh, goodness, I don't know.
Q. How long has Mandarich used JST?
A. It's been maybe 18 months.
Q. What did you use before JST?
A. We used a system called Eagle. It was proprietary to one of our previous clients.
Q. Which client was that?
A. CACH.
Q. Why did you switch?

Page 24

A. CACH was purchased by another company.
Q. What's the name of that company?
A. Resurgent.
Q. Does Mandarich work for Resurgent?
THE WITNESS: Nicole?
MS. STRICKLER: I mean just answer as you know.
A. Resurgent is a client of Mandarich.
Q. (By Mr. Santiago) So you mentioned that the JST system prompts the operations team to draft a complaint in a case.
A. Yes.
Q. Is that correct?
A. Yes.
Q. So the Eagle system, did it do the same thing?
A. No.
Q. So when the Eagle system existed, what prompted the operations team to generate a complaint?
A. We used a third-party software that was only legal in nature, called Q-Law. We generated documents from that program, not from Eagle.
Q. So you generated documents using Q-Law.
A. Yes.
Q. Did Q-Law prompt the operations team to draft complaints?
A. Yes.
Q. How did it do that?
A. It did it by program logic.
Q. Do you know anything about the program logic?
A. Yes.
Q. How did the program logic work?
A. It was built by attorneys regarding state work flow. And as it relates to the actual coding, it was coded by several different individuals, including Q-Law programmers, from information based on what the attorneys had requested.
Q. So in relation to complaints, do you know how Q-Law worked in prompting the operations team to draft a complaint?
A. Generally speaking, if there wasn't a settlement and a demand letter had been sent, and the time frame for the demand letter had lapsed, and it was not -- there was no arrangement, there is no bankruptcy, no reason why shouldn't proceed with the lawsuit, then the system would prompt for a lawsuit.
Q. What was the time frame from, you said, demand letter to complaint?
A. I don't remember the program or the time

frame for Q-Law. It was after the time in which the demand letter would lapse, but I don't remember exactly what that time frame would have been.
Q. So you mentioned that the operations team also generated motions for default?
A. Yes.
Q. So going back to the Eagle system and the Q-Law system, did those -- strike that.
Did Q-Law prompt the operations team to draft motions for default judgment?
A. Yes.
Q. And how did it know to let the operations team know to draft the default judgment?
A. Similar to the items I had just mentioned with regards to the complaint.
Q. So when a specific time frame had passed between the complaint being served, and I guess the date that -- strike that.
So there was a specific time frame slotted in, from the time when a complaint is served, to let the operations team know to draft a default motion?
A. Yes. And there were a myriad of other things, like I had just mentioned; if there was a bankruptcy, or if we made an arrangement, or if there were certain things that had taken place, then it

wouldn't trigger it.
Q. Did the Q-Law system also notify the operations team that a writ of garnishment needed to be generated?
A. Generally. If a judgment had been entered and if an asset had been located that would be viable for a post-judgment remedy in a particular state, then it would be.
Q. What is an asset?
A. Something that a post-judgment remedy could seek. So a wage garnishment or a bank levy.
Q. How did Mandarich determine that an asset was available?
A. Skip tracing efforts.
Q. So what would happen with a complaint after it was generated by the operations team?
A. It would be printed, collated, given to an attorney for the jurisdiction.
The attorney would review the complaint, review the software program, look for all the same items that the system said did or did not exist. Sign it, if they had approved it. Then it would go back to the operations team for however it would get filed or sent out.
Q. Were these complaints generated one at a

time or were there multiple complaints generated?
A. It depends on when and who. You could print more than one, you could print one at a time. It really just depends.
Q. So what would happen with a motion for default judgment after it was printed by the operations team?
A. Similar to a complaint. Same steps.
Q. And is this the same for both the JST and the Q-Law systems?
A. Yes.
Q. Same process?
A. Yes.
Q. So we went over some of the documents that the operations team produced. Can you give me some examples of documents that attorneys would produce?
A. Standard motion practice type documents. Maybe some letters. Oppositions. Replies. Those types of things. But they may generate a complaint here and there, it just really depends.
(Exhibit 2 marked for identification.)
MR. SANTIAGO: Nicole, document I sent you, Summons and Complaint, I'm having that marked as Exhibit 2 now.
MS. STRICKLER: Is that the one you named

2014 complaint?
MR. SANTIAGO: Right.
MS. STRICKLER: Got it. Thank you.
Q. (By Mr. Santiago) You're looking at what's been marked as Exhibit 2. Do you recognize that document?
A. Generally I do, yes.
Q. What is it?
A. It is three pages. The first page is a Summons for a King County case. Then the second two pages is a Complaint.
Q. So turning to page two, which is titled a Complaint -- I'm sorry, let's turn to page three. What is the date?
A. 9/9/2014.
Q. And to the right of that date is a signature block.
Do you recognize that signature?
A. Yes.
Q. Whose signature is that?
A. Mine.
Q. And it says your name there, correct?
A. Yes.
Q. And that's your Washington bar number?
A. It is.

Q. So the date on this document, what does it signify?

A. It signifies the date that I approved the suit and signed it.

(Exhibit 3 marked for identification.)

MR. SANTIAGO: Nicole, we're now moving to what's going to be marked as Exhibit 3. And I don't remember what I titled it, but it's basically the Declaration of Service.

MS. STRICKLER: Got it. Thank you.

Q. (By Mr. Santiago) So you're looking at Exhibit 3. Do you recognize that document?

A. It looks like a proof of service from our service provider.

Q. You said it looks like one. Is it one?

A. It looks like one.

Q. So if we can skip down to the second paragraph where it says on the 18th day of September 2014 at 7:23 p.m., and then we'll skip forward here, Thomas Weinstein was personally served.

Do you see where I'm talking about?

A. Yes.

Q. And at the bottom left corner it says "For Mandarich Law Group LLP."

Do you see what I'm talking about there?

A. I do.

Q. So is this a proof of service that Mandarich would have relied upon in the case against Thomas Weinstein?

A. Yes.

Q. Now, this refers to, if you look in the top right caption, Declaration of Service of Summons; Complaint.

Do you see what I'm talking about there?

A. Yes.

Q. Is Exhibit 2 the summons and complaint that this proof of service is referring to?

A. I believe so.

Q. Do you have any reason to believe that it isn't the summons and complaint that was served on Mr. Weinstein?

A. I don't.

Q. Did Mandarich Law Group have any communications with Mr. Weinstein after he was served with a copy of the complaint, that is Exhibit 2?

A. After he was served. So he was served in September. I believe we communicated with him in October as he had contacted our office to settle his case.

Q. So how did that communication come about?

A. I believe he called our office to settle his case.

Q. Do you know what happened on the call?

A. I did listen to the call, so yes.

Q. And what happened on the call?

A. Let's see. So Mr. Weinstein called to try and get a reduced amount on the debt he owed. He was given a couple of options for payment. He agreed to a particular option. He entered his, I believe it was a debit card, I can't remember exactly if it was debit card information to pay on a monthly basis.

He was told he would be sent documentation that he would need to sign and send back. He had asked if it could be emailed. We told him we needed the original. And that was in the nutshell what the call sounded like.

Q. Do you know the person that works for Mandarich that was on the other end of that call?

A. Ned Flores. He was a former collector of Mandarich.

Q. So he's no longer employed by Mandarich?

A. He's not.

Q. When did he leave?

A. I don't know. It's been awhile for sure. Years.

Q. Do you know why?

A. I don't. I did not look into his personnel files.

MR. SANTIAGO: Can we go off the record for a second.

(Off the record 12:09-12:11.)

Q. (By Mr. Santiago) We were talking about Mr. Weinstein's call to Mandarich, and you had mentioned that he wanted to enter into a payment plan.

Did Mr. Weinstein get anything in exchange for setting up a payment plan?

A. Yes. I believe we sent him a letter and a stipulation.

Q. And so that's what he received in exchange for setting up a payment plan?

A. No. The letter was explaining the document that was attached, which was a stipulation, but that document needed to be signed, sent back, and that he needed to continue to make payments -- I'm sorry, to begin to make payments in order to have an agreement with our firm.

Q. So did Mr. Flores tell Mr. Weinstein that he would need to sign a stipulation in order for the agreement to be solidified?

A. He told him that he would be sending him

Page 34

documentation that needed to be signed and sent back. In the letter itself that was sent to him, it was very clear about what needed to be done.

Q. Did Mr. Flores receive training regarding the FDCPA or any state collection law?

A. I can't speak specifically to Mr. Flores, it's been quite sometime. Again, I could speculate and say that he had, because that was our company policy. But to tell you specifically, I just haven't seen his records.

Q. So you don't recall when he left. Is it possible that his records are still available with Mandarich?

A. It's possible.

Q. Would that include any training records or --

A. It may.

Q. -- compliance records?

A. It may. We've added different programs to maintain those things over the years, so I just don't know when his employment stopped and started and when those were in conjunction with his employment. So I just don't know what that looks like specifically for him at that time.

Q. Does Mandarich have any policies about

Page 35

retaining documents regarding former employees, like for example a period of time that they're retained or anything like that?

A. I don't know the human resources policy as it relates to that maintenance.

As it relates to maintaining legal documents, you know, we have state bars that require us generally to retain them certain time frames, and we comply with that. But for purposes of our human resources retention, I'm not a hundred percent sure what that looks like.

Q. Do you recall what the terms were for Mr. Weinstein's payment plan?

A. Just generally I could tell you them. I mean there was he was going to make an initial payment, then he was going to make payment over -- a monthly payment for, I believe it was a little over two years on a monthly basis.

It was going to be debited from either a credit card or debit card that he had provided to the company, so that it would be automatic. And the stipulation stated that as long as he made those payments that we would not -- that he make those payments and that he would sign the stipulation and return it, that we wouldn't go forward.

Page 36

Q. Were any of the terms of the stipulation mentioned on the call?

A. I'm not sure. Yeah, I mean the terms with regards to the payment structure and everything, they agreed upon all of that up front, yes.

Q. Other than that, did they agree on anything?

A. I don't believe so. I'm not sure.

Q. Did Mr. Weinstein get anything in exchange for setting up a payment plan?

A. What do you mean?

MS. STRICKLER: I'm going to object just because that's been asked and answered. But go ahead.

Q. (By Mr. Santiago) Sorry. You were saying?

A. What do you mean?

Q. Well, he called and he set up a payment plan because he received a lawsuit; is that --

A. I don't know if --

MS. STRICKLER: Object to form.

A. I don't know if that's why he called.

Q. (By Mr. Santiago) Fair enough.

A. But he did call and acknowledge his debt and that he wanted to repay it. That's all I do know.

Q. So he called and set up a payment plan. What did he get in exchange for the payment plan?

A. What did he get in exchange. Well,

Page 37

Mandarich Law Group would no longer proceed against him with any legal remedy, as long as he signed the document, returned it, and made his payments per the arrangement.

Q. Was he told that Mandarich would not go forward with legal action?

A. The stipulation was very clear about that, yes.

Q. Was he told on the phone call?

A. I don't believe so.

Q. Was he told that he needed to sign a stipulation on the phone call?

A. I don't recall the term stipulation being used.

(Exhibit 4 marked for identification.)

MR. SANTIAGO: Nicole, I think the document is called like letters that weren't produced.

MS. STRICKLER: Got it.

Q. (By Mr. Santiago) So you are looking at Exhibit 4.

A. Okay.

Q. Do you recognize those documents at all?

A. Again, generally I do.

Q. And when you say generally you do, what does that mean?

A. I don't generate them, so I've seen documents that look just like this, yes.
Q. Who generates them?
A. Our programs, our software programs.
Q. Does any human interact with the software program to produce the letter?
A. Yes, the information that's added to them.
Q. And so you mentioned several departments earlier. Which department handles that?
A. I don't know for sure. This was in 2014. I believe that the information that would have been added by either Ned Flores or your client, at the time when they used the IVR program, when he entered in his debit card information, that information was retained and it was added to this letter.
Q. So who prints out the letter?
A. I don't know this particular letter. I don't know who printed this out. I cannot remember.
Q. Generally speaking which department prints it out?
A. Honestly I don't know.
Q. So you said generally speaking you know what that is.
Have you seen a letter like this that was sent out by Mandarich before?

A. In this matter or in others?
Q. Any matter.
A. Yes.
Q. So you recognize the format of the letter.
And the letter is a template; right?
A. Yes.
Q. And you're familiar with the template.
A. Yes.
Q. So what is the purpose of a letter like this?
A. The purpose is to communicate the arrangement that was made with the customer. And there are also some federal regulations surrounding this letter that require it to be sent.
Q. And I can represent to you that this was not produced by Mandarich in discovery; this is a letter that my client had.
Do you know why Mandarich does not have a copy of this letter or why it didn't produce it?
A. It's very possible because this was in 2014, that because we no longer have access to the programs, and I don't even believe they exist anymore, that is the reason why we may not have had it.
I can also tell you that we used a third-party vendor on occasion to send letters, and it

could have been sent by them. But again, I don't know for sure.
Q. So when you use a third-party vendor to send letters, do you get a copy of the letter that the third party sends out?
A. Again, I believe the copy is retained by the third party. I believe in some circumstances we obtain the letters, but I don't necessarily know if all of them were. I really just don't know. It's very possible that we got them all, I just don't know. It's possible the client got them, but I don't know that process.
Q. And for the record, we've been talking about page one through three, which is one letter, and then there is a second letter that starts on page four.
Do you agree with that assessment?
A. No. It looks like -- so the first, page one and two, is one letter.
Q. You're correct. I'm sorry. Thank you.
A. Sure. And then page three and four is a second letter. And then page five and six is a third letter.
Q. And so the letter that we were talking about, which purpose was to communicate the arrangement made between Mandarich and Mr. Weinstein,

is page one to two.
A. Is one to two.
And also, just to clarify, because we're kind of throwing terms out here like arrangement and stipulation and settlement. Generally speaking, this document was to inform your client that his card was going to be automatically debited, and these were the times that they were going to be debited.
So it didn't necessarily say that this is your settlement agreement and this is what is going to govern your contract between you and CACH, it just told him what was going to come out of his checking account, what he agreed to, and what Mandarich and CACH is required to do by law.
If we didn't send this, we could have had an issue.
Q. What law is it that requires you to do that?
A. You know, I'd have to go back. I don't have it memorized. But I can tell you that there is a regulation that requires it.
Q. Is that federal or --
A. I believe it's federal, yes.
MS. STRICKLER: Can we go off the record just for a second.
MR. SANTIAGO: Sure.

(Off the record 12:23-12:27.)
Q. (By Mr. Santiago) Turning back to page one and two of Exhibit 4, what are the circumstances under which this letter would be sent out?
A. What I believe it to be, again, because this was, what appears to be three and a half years ago, was if there was a recurring payment that was set up, that this letter would be sent out to communicate that to the consumer so that they were aware of that recurring payment.
Q. And then I guess who would draft this letter?
A. The template itself or this particular one?
Q. I guess I would say -- strike that.
Not the template, but the letter itself, who would prompt this to come into existence?
A. If there was a recurring payment entered into, I believe it was Eagle at the time, then this letter would be generated.
Q. Automatically?
A. Yes.
Q. And then what would happen after it was generated automatically?
A. It would get printed based on -- it would get printed. I believe the third-party letter vendor

would create it and mail it.
Q. So you mentioned that this was a long time ago and these are the sort of things you believe had happened.
Is there anyone who would know?
A. Specifically? Gosh, I mean I don't know. The reason I say that is because things have changed. You know, we just had a discussion about structure changes with regards to CACH, and so things changed over the years. So that's the only reason why I can't specifically say I believe that that's what happened with this particular item. But that circumstance had occurred with our letters.
Q. So I'm sort of going to ask you a hypothetical here.
If this payment arrangement in this letter had been completed, what would happen next?
MS. STRICKLER: Objection; speculation. Go ahead, Ryan.
A. So just to confirm, so when you say "completed", you mean if all of the payments listed on this letter were made.
Q. (By Mr. Santiago) Correct.
A. If all of the payments on this particular letter were made, it depends on where the file is in

the legal status. If it was a nonjudgment file, then the case would be dismissed. If it was a judgment file, then a satisfaction of judgment would be filed with the court. Generally speaking that's what would happen.
Q. Do you know where in the process this particular case was at the time that this letter was generated?
A. When this letter was generated, October 6, I believe that we had sent a lawsuit to your client and it had been served, but it had not been filed with the court at the time.
Q. So based on that status, what would have happened if all of these payments were made?
MS. STRICKLER: Objection; speculation. Go ahead, Ryan.
A. So for purposes of service, what would have happened is is we would have obtained a signed stipulation. Once we obtained a signed stipulation, we would have waited for the payments to all be made. And once they were made, because the case wouldn't have even been filed, there would be no further legal action. We would report to our client that all matters would have been paid and they would have closed the file.

I don't know exactly from there what our client would have done, but that's what we would have done for this file.
Q. (By Mr. Santiago) So for cases that -- strike that.
This is going to be a very specific question. For cases filed -- sorry, strike that too.
For cases served in Washington but not yet filed, when a debtor sets up a payment plan is it standard procedure to ask them to sign a stipulation.
A. Yes.
Q. Is your collection team aware of that?
A. Yes.
Q. Were they aware of it in 2014?
A. Yes.
Q. Are they trained to make debtors aware of that when they call in to make a payment plan?
A. Make them aware of what?
Q. Make them aware that in order to enter into a payment plan they have to sign a stipulation?
A. Yes. To qualify, I don't know what language they use, but they do communicate to the consumer that they will be receiving documentation that they need to review and submit back to the firm. Whether they call it a stipulation, legal documents, whatever they might

call it, I can't attest to that.
Q. Are they trained to use specific words, or are they just trained to tell the debtor that they have to sign a document?
A. It depends. I don't have all the scripting memorized, so I'm not sure exactly what they're trained for that purpose.
Q. Are they trained to tell them what a stipulation entails? And when I say "them", I mean the debtor.
A. I don't know.
Q. When a collector starts a payment plan with a debtor who calls in, and this is going to be a payment plan subject to a stipulation, are the -- strike that. I'm trying to think of a good way to phrase this.
Are your collectors trained to tell a debtor who sets up a payment plan what is involved in signing a stipulation?
A. What is involved in signing a stipulation. Our collectors --
MS. STRICKLER: I'll just object as vague. But go ahead.
A. Our collectors don't have a copy of the stipulation every single time in front of them to read

to the consumer. We tell them, being the consumer, that they will be receiving a document, they need to review it and sign it and send it back. And I think the documents speak for themselves. They're written in English language. I would assume the consumers can understand them. If they were asked to be submitted in a different language, we would do that. But other than that, no.
Q. (By Mr. Santiago) When a debtor sets up a payment plan does Mandarich ever take payments before it receives a signed stipulation?
A. Yes. And if we didn't receive a signed stipulation, the letter that is sent with the stipulation tells the consumer exactly what happens if they don't.
And if they had an issue with regards to the agreement, and called and said, I don't agree with this and I don't want to enter into it, then they would be refunded their money.
Q. So if Mandarich doesn't receive a stipulation back and somebody sets up a payment plan, does Mandarich continue to take payments?
A. Yes.
Q. Why is that?
A. It's specific in the letter. It's actually

bolded and in all caps.
Q. We'll actually go over that letter later.
A. Perfect.
Q. So someone can set up a payment plan with Mandarich and Mandarich will take money on that payment plan before the debtor is aware of the terms; is that correct?
A. Aware of what terms?
Q. The terms of the stipulation.
A. What terms?
Q. The terms that are in the stipulation.
A. Yes. And as I mentioned before, many times a consumer actually wants to pay at that time. And if they don't agree with the stipulation, then they can be refunded their money.
Q. What is the date on page one of Exhibit 4?
A. Referring to this one?
Q. Yes.
A. October 6, 2014.
Q. Do you have any reason to believe that that is not the date that this letter was sent out?
A. No.
MR. SANTIAGO: Can we go off the record for a second.
(Off the record 12:37-12:38.)

Q. (By Mr. Santiago) So if you can turn to page three of Exhibit 4, do you know what that is?
A. Let's see. Yes. It looks like a letter that we sent to the consumer -- I'm trying to look for the date really quick -- letting them know that their recurring payment will be taken from their checking account, or their debit card, or whatever it was set up as, forewarning them.
Q. Is this a standard letter that Mandarich sends out when someone sets up a payment plan?
A. Yes, a recurring payment plan.
Q. And when is this letter sent out?
A. It's sent out prior to the account having withdrawal.
Q. And you do this on every recurring payment plan?
A. If it's recurring and it's to be an automatic that's given to us either by checking account or debit, then yes. If it was a payment plan where we didn't have that information, then no.
Q. So basically someone sets up a recurring payment plan, this letter goes out every time a payment is going to be drawn from whatever they set up as their payment account.
A. Yes. The intention is to let them know what

is going to happen, yes. And it's triggered based on the payment plan that's entered into; I believe at the time it was Eagle. So as long as that payment plan is entered into Eagle and it shows as active, this letter will go out.
Q. Is this still the procedure for recurring payment plans for Mandarich?
A. It is for checking accounts.
Q. Can you tell, based on looking at this letter, what date this letter was sent out?
A. I'm looking. So we're saying when it's going to be debited, which is December 27th of 2015. I don't know if I see a date on it. I don't see a date on it.
Q. So is it fair to say it would have went out before 12/27/2015?
A. I would hope so. I would hope so.
Q. So I can represent to you that we didn't get this letter from Mandarich in discovery, as we've discussed, you know, we understand that it's unavailable, that's fine. This is a document that my client had.
Now saying all that, I forgot what my question was.
MS. STRICKLER: Is it do you have any reason

to believe this letter was not sent?
MR. SANTIAGO: Thank you.
Q. (By Mr. Santiago) Do you have any reason to believe this letter was not sent? That's exactly what I was going to ask.
A. I do not. I have no reason to believe that.
Q. Was Mr. Weinstein making payments at the time this letter was sent?
A. I apologize, I don't know the time frame of all of his payments, so I don't remember when they stopped to be honest with you. I can't remember. Gosh, I don't remember, I'm sorry.
Q. We'll come back to that.
(Exhibit 5 marked for identification.)
MR. SANTIAGO: Nicole, I'm having Exhibit 5 marked. It's Mandarich's response to first set of interrogatories.
MS. STRICKLER: Okay. This is just the regular responses to interrogatories, not the supplemented?
MR. SANTIAGO: Correct.
MS. STRICKLER: Okay. I got it. Thank you. Can we go off the record for a second.
(Off the record 12:44-12:47.)
Q. (By Mr. Santiago) Going back to page three

of Exhibit 4, do you know if at the time this letter was sent Mr. Weinstein was making payments?
A. I believe he was.
Q. So now turning to page five of Exhibit 4, I can represent to you that this is a document that wasn't produced by Mandarich in discovery, which is fine, but Mr. Weinstein had it in his records and we produced it to you in discovery.
Do you know if Mr. Weinstein was making payments at the time that this letter was sent out?
A. I don't believe so.
Q. Why not?
A. My understanding is that his card expired that we had on file, we attempted to communicate with him, and then subsequently his attorney, to no avail. We did on multiple occasions, but were unable to obtain a new card.
Q. How did you attempt to communicate with him?
A. By telephone.
Q. Does Mandarich have records of those attempted communications by telephone?
A. I don't believe we have any recorded calls.
Q. Why not?
A. I don't believe there were any actual -- we never were able to communicate with anybody.

Q. So in other words he didn't answer the phone?
A. Right.
Q. And if his voicemail would have answered, for example, would Mandarich leave a message?
A. Depends. If there was a message, then we would have a recording. I don't believe we have any, so I don't believe we left any voicemails, but I can't be sure.
Q. So how do you know that Mandarich made calls exactly?
A. A review of the legal file.
Q. And the legal file is paper or electronic?
A. Paper.
Q. So you have a paper file at Mandarich, at your office, that lists phone calls made to Mr. Weinstein?
A. Phone calls that would have been made to either Mr. Weinstein or his attorney at the time.
Q. And I guess what is the information contained there? What I mean by that is like is it date and time or --
A. Oh, gosh, I believe date and time, I believe that's included. And a notation from whomever might have made an attempt.

Q. Who generally would be making the attempt?
A. A collector.
MS. STRICKLER: Tyler, I think that the legal file in this case was not produced just pursuant to privilege and work product, and that there was a state court case, collection case.
But if you want to know like when messages were left for the attorney, I'm happy to supplement and give you that information.
MR. SANTIAGO: Sure.
MS. STRICKLER: I don't believe we have the recordings, again because of that system issue that we discussed earlier with the transfer of systems, but I'm happy to give you the dates and times that we tried to contact Mr. Weinstein's attorney.
MR. SANTIAGO: Sure. Thank you. I appreciate that.
Q. (By Mr. Santiago) Going back to page five of Exhibit 4, this letter has the date of January 15, 2017; is that correct?
A. Yes.
Q. Any reason to believe that this letter was not sent out on that date to Mr. Weinstein?
A. No.
Q. And this is a standard letter that's sent

out when somebody enters into a payment plan?
A. A recurring payment plan, yes.
Q. And Mr. Weinstein, for whatever reason, had stopped making payments prior to this letter.
A. I believe so, yes.
Q. So if he had stopped making payments, why would Mandarich send a letter saying that they were going to deduct from his account?
A. So earlier when we were talking about how the letters are generated, I'm going to say it in generalities because I don't know the specifics, but if you enter an active recurring payment plan into the former system Eagle, as long as that plan states that it's active in the system, these letters will be triggered. So they run parallel to an accounting program that might withdraw the funds.
So at this time when this letter was sent, January 15th of 2017, Eagle would have shown that it was still active, and the system automatically sent the letter.
Q. Was the payment plan active at that time?
A. He wasn't paying. But from what I recall, the collectors were still trying to revive payment and so it hadn't been deactivated.
Q. And this would be about nine months later

since his last payment?
A. It looks like it.
Q. And do you have any reason to believe that letters would not have gone out monthly during the interim period, between the time the payment stopped and this particular letter?
A. If the plan was active in the system, they should have gone out every month.
I'm sorry, does that answer your question?
Q. Yes. Thank you.
Would this still happen if someone had set up a payment plan and then stopped paying, say they set up a payment plan tomorrow, they stop paying in, I don't know, August, would these monthly letters still go out even though they stopped paying?
A. They would continue to go out until the file was reviewed and it was determined it was no longer active, and then it was triggered to not be active. So it would have to be reviewed and modified.
Q. What would prompt that review?
A. It's done by the collection team, and ultimately I believe approved by the manager that runs that team. So it's at their discretion.
Q. So there is no interaction between the processing of the payment and the sending of a letter

about that payment? Do I understand --
A. No interaction?
Q. -- what happens correctly?
Right. So one system or one department collects payments, and another system or department sends out these letters regarding those payments; is that correct?
A. Generally I believe that's the case, at least at this time with the system that we had.
Q. How about the new system?
A. So we still have an accounting department that processes payments. I don't know if there is any difference at this time.
Q. So the only way these letters would stop going out is if somebody reviewed this specific file and noticed that payments had stopped.
A. Yes.
Q. And manually changed it.
A. I believe so.
Q. So these letters would go out in perpetuity until the account is satisfied?
A. Yes.
Q. And I'm sorry, I may have already asked this, but -- actually I did. Strike that.
MR. SANTIAGO: So I think that's a good

place to stop for just 30 minutes.
(Recess 12:58 p.m. to 1:32 p.m.)
Q. (By Mr. Santiago) Can I have you turn back to Exhibit 4 one more time?
A. Yes.
Q. And just going to page five, which is the January 15, 2017 letter.
A. Yes.
Q. So we've already established that Mr. Weinstein's payments were no longer being processed at that time --
A. Yes.
Q. -- when this letter went out.
And right before the break I asked you a question, which was whether this form letter would go out in perpetuity until the payment arrangement was fulfilled, and you said yes, it would.
A. And I wanted to qualify that.
Q. Okay.
A. So currently -- first of all, we don't take ACH cards anymore; so I wanted to clarify that. Generally speaking we don't take it. So no, they wouldn't go out in perpetuity because of that reason.
And then secondly, if somebody was on -- and I was trying to say this earlier, but I don't think it

came out the right way; is that if we take a checking account and we have a postdated check letter that's sent, that's similar to this type of letter, it would be reviewed and it would not continue to go out in perpetuity; it would be canceled if an NSF came through.
But in this circumstance, because his card continued to be declined, the system had kept trying to run it and run it and run it, and I think that was part of the delay.
Q. So when would these letters have stopped?
A. When would these letters have stopped.
Q. At the time when the system was in place before your changes and whatnot, when would these letters have stopped coming to Mr. Weinstein based on the situation here?
A. When the payment that were being made had stopped, and it would have been reviewed and determined that it was no longer an active arrangement.
Q. So going back to page one and two of this exhibit, the last payment would have been February 27, 2017; is that accurate?
A. According to this letter, that's what it says.

Q. Would the letter, beginning on page five, would those keep being sent -- would those continue to be sent to Mr. Weinstein or anyone beyond the end date of their payment plan?
A. No.
Q. So is it fair to say they would stop when the payment plan was supposed to be over?
A. My understanding is they would stop, yes.
(Exhibit 6 marked for identification.)
MR. SANTIAGO: Nicole, Exhibit 6 is the packet of letters from the discovery responses, the second round.
MS. STRICKLER: Okay.
Q. (By Mr. Santiago) So --
A. I apologize. You said from the discovery responses?
Q. From Mandarich's discovery responses, yes.
A. Thank you.
Q. You have Exhibit 6 there. Do you recognize that document?
A. The first page or all of them?
Q. Yes. Do you recognize those documents?
A. It looks like a demand letter and then a series of card letters, yes.
Q. And when you say "a series of card letters",

what does that mean?
A. They're multiple letters that state that we're going to debit $97.33.
Q. Do you have any reason to believe that those letters were not sent to Mr. Weinstein?
A. I don't.
Q. Were the letters sent to Mr. Weinstein?
A. I didn't send them personally, but I have no reason to believe they weren't sent.
Q. Do Mandarich's records indicate that these were sent to Mr. Weinstein?
A. I believe they do.
Q. So looking at page one, this letter was sent or at least printed on August 2, 2014; is that correct?
A. Yes.
Q. And what is the purpose of this letter?
A. This is an initial demand letter that is sent to a consumer to let them know that this account exists and that our firm represents the creditor on the account, gives them information regarding the balance, and a myriad of required disclosures.
Q. So starting in the middle where there is a bunch of categories; creditor, account number, original creditor. Do you see that?

A. Yes.
Q. So the creditor on the account that Mandarich is trying to collect from Mr. Weinstein is CACH, LLC?
A. CACH, yes.
Q. Oh, sorry.
A. That's okay. Everybody calls it cash, but it's CACH.
Q. Okay. And the original creditor was GE Capital Retail Bank?
A. That's what it says, yes.
Q. Is that correct?
A. I believe so.
Q. And the original creditor account number is listed.
Date of last payment to original creditor doesn't have any information; is that correct?
A. Yes, we didn't have that information.
Q. When you say "we", do you mean Mandarich or CACH?
A. Both.
Q. Why wouldn't they have that information?
A. I don't know.
Q. And the current balance due is, it says $3,028.05.

A. Yes.
Q. Is that a principal amount, or does that include interest and fees or anything?
A. It's the balance that is sold from GE Capital Retail Bank to CACH.
Q. So it's all principal?
A. I can't speak to how it might be divided up. I'm not a party to that prior to. So CACH will give us this amount to collect on.
Q. Does CACH give you any documents to support this claim when you send out this letter?
A. Yes.
Q. What kind of documents?
A. We may get -- it depends. Specifically are you asking me, or are you asking me generally?
Q. Generally speaking.
A. Generally. They might give statements, if it was a credit card they might give transaction history, bills of sale, redacted loan schedules, loan files, applications. It depends on the file and what is available.
Q. Were any of those things available in Mr. Weinstein's case?
A. I believe they were, some of them. I don't believe all of them were available or existed.

Q. Did any of those documents contain the date of last payment?
A. I'm not sure.
Q. Did any of those documents contain a breakdown of the current balance due, whether it was principal or interest, or fees, or anything like that?
A. I'm not sure. I have not reviewed the underlying documents.
Q. You have not reviewed the underlying documents from Mr. Weinstein's collection case?
A. Not for today. This was three years ago.
MR. SANTIAGO: Off the record for one second.
(Off the record 1:41-1:42.)
Q. (By Mr. Santiago) So turning to page three --
A. Okay.
Q. -- do you recognize this document?
A. Yes. Generally it looks like a letter that was sent to inform Thomas Weinstein that $93.33 was going to be debited from his account.
Q. And when was that to be debited?
A. It shows January 27, 2016.
Q. We looked at some of the other letters that were -- that Mr. Weinstein had in his possession, that

was Exhibit 4.
Do you agree that some of those letters predated this one?
A. Yes.
Q. So Mandarich doesn't have access to letters before this date, letters similar to this on Mr. Weinstein's account?
A. I'm not sure what we had access to just based on what we talked about before, since these were sent by a third-party vendor that our former client had control over. I'm not sure which ones were which.
Q. Is it fair to say that letters similar to this went to Mr. Weinstein before this date?
A. Yes.
Q. And typically these letters go out every month before a withdrawal is made from a debtor's account?
A. Yes.
Q. And on the date -- well, strike that.
Is it fair to say that this letter went out before January 27, 2016?
A. I would say yes.
Q. Any reason to believe that this letter wasn't sent to Mr. Weinstein?
A. No.

Q. And was Mr. Weinstein still making payments at this time?
A. Yes.
MS. STRICKLER: Just to try to speed this up a little bit, if we can, I don't think we're in dispute about the fact that payments stopped being made in March of 2015, I believe. And then we have no reason to believe any of these letters that we produced, that we got from the vendor, did not go out in this exhibit.
Does that help you --
MR. SANTIAGO: Yeah, that's fine.
MS. STRICKLER: -- not to have to go through every single one of them?
MR. SANTIAGO: Yeah. Just so you know, I'm going to go through every single one of them but, based on what you've said, it should go a lot faster.
MS. STRICKLER: Okay.
Q. (By Mr. Santiago) So can you turn to page five of Exhibit 6.
A. Yes.
Q. Actually strike that. It wasn't a question so we don't need to strike it. I'm sorry.
Can you look through the remainder of those letters, and tell me if you have any reason to believe

that any of them were not sent.
A. I don't have any reason to believe that they were not sent.
Q. And we previously agreed that payments were stopped in March of 2016; is that correct?
A. Yes.
Q. So is it fair to say that any letter sent after March of 2016 was sent despite the fact that payments had stopped?
A. Yes.
(Exhibit 7 marked for identification.)
MR. SANTIAGO: Nicole, we're going on to 7, which is the 2015 Complaint.
MS. STRICKLER: Okay.
Q. (By Mr. Santiago) And before we look at that -- actually never mind. Let's look at that. Sorry.
A. Okay.
Q. Do you recognize Exhibit 7?
A. This looks like a Complaint against Mr. Thomas Weinstein that was filed.
Q. And when was it filed?
A. Let's see. It was filed October 5th of 2015.
Q. Can I have you turn to page two?

A. Yes.
Q. On the bottom left there is a date.
A. Yes.
Q. What is that date?
A. 9/30/2015.
Q. And to the right of that is a signature?
A. Yes.
Q. Is that your signature?
A. Yes.
Q. I'm going to refer you back to Exhibit 3. Can we look at page three? I'm sorry, is Exhibit 3 the Summons?
A. 2?
Q. Yes, Exhibit 2.
A. Sure.
Q. That's on page three.
A. Okay.
Q. So this document is a complaint that Mandarich sent to Mr. Weinstein; is that correct?
A. This document meaning Exhibit 2?
Q. Exhibit 2, yes.
A. He was served with this by our process server.
Q. So Mandarich hired a process server and Mandarich's process server did indeed give this

document to Mr. Weinstein.
A. I believe so.
Q. So going back to Exhibit 7, and if we could actually have both open here, page three of Exhibit 2 and page two of Exhibit 7.
A. Sure.
Q. There are different dates on these documents; is that correct?
A. Yes.
Q. Why are there two different dates on the complaint against Mr. Weinstein?
A. The complaint was regenerated.
Q. Why?
A. It's how we print our complaint.
Q. Why did Mandarich not file the complaint that was served on Mr. Weinstein with the court?
A. It's identical except for the date.
Q. So the reason behind filing a new regenerated document is because it's identical except for the date?
A. The reason?
Q. Yes.
A. We regenerated the complaint and filed the one that was regenerated. So the one that was regenerated had a different date on it. Everything

Page 70

else in the complaint is identical.
Q. So is it fair to say that the same complaint that was served on Mr. Weinstein was not filed with the court?
A. The actual document with the date of 9/9/2014, does not appear to have been filed with the court.
Q. So again, I'll just rephrase the question. Is it fair to say that Mandarich did not file the complaint that was served on Mr. Weinstein with the court on October 5, 2015?
A. Can you rephrase?
Q. Sure. Is it fair to say that Mandarich Law Group filed a different complaint than the one that was served on Mr. Weinstein?
A. Only for the date.
Q. So this complaint was filed on October 5, 2015. What was the reason for filing the complaint?
A. Your client was in breach of his agreement, and so we could not get ahold of him to revive his arrangement, and we had no other way of communicating with him, because his attorney was not getting back to us, so we proceeded legally.
Q. So in October of 2015 --
A. That's what it looks like.

Page 71

Q. -- Mr. Weinstein was in breach of the agreement?
A. Yes.
Q. How was he in breach?
A. He didn't return the stipulation.
Q. Did an attorney contact Mandarich about the case in October of 2015 or any time before that?
A. I'm not sure when the attorney contacted us. Because either before or after, either way, we couldn't get ahold of him.
Q. So you're not sure if an attorney was working on this case for Mr. Weinstein in October of 2015?
A. Let me think back to my review. I believe it was after this time that Mr. Weinstein retained an attorney, I believe.
Q. So --
A. So we would have attempted to contact Mr. Weinstein directly to revive, and we were unable to. Post we were unable to get ahold of the attorney as well, I believe. But I don't have my notes so I'm not exactly sure.
Q. So in October of 2015 Mandarich filed the lawsuit against Mr. Weinstein --
A. Yes.

Page 72

Q. -- in King County Superior Court.
A. Yes.
Q. And the reason was because he was in breach of the agreement?
A. Yes.
Q. And he was in breach because he didn't return the stipulation.
A. Well, there was never technically an agreement, because he never signed it, which was explained to him in the letter that I referenced multiple times.
Q. We talked earlier about notes of attempts to contact Mr. Weinstein and his attorney.
Do those notes include attempted contacts in October of 2015?
A. I'm not sure. We can look and get you that information, but I'm not sure.
MR. SANTIAGO: Nicole, are you okay getting that together?
MS. STRICKLER: I'm sorry, what was that again? The contact with --
THE WITNESS: The attempts.
MS. STRICKLER: -- the attorney?
MR. SANTIAGO: The attempts to contact Mr. Weinstein in October of 2015, if it exists.

Page 73

MS. STRICKLER: Sure.
A. I do know that it exists at least prior to that.
Q. (By Mr. Santiago) Attempts to contact him exist prior to October of 2015?
A. Yes.
MS. STRICKLER: And if you like, I can just give you a list of all the times we attempted to talk to him.
MR. SANTIAGO: Yeah, that would be great.
MS. STRICKLER: That's fine. I'll just need to make a note real fast. Okay. Go ahead.
Q. (By Mr. Santiago) So we just established that the reason Mandarich filed this lawsuit is because Mr. Weinstein had not followed through with the terms of the agreement.
Was he still --
A. I'm sorry, I just wanted to clarify.
Q. Sure. Go ahead.
A. Again, there wasn't an agreement ultimately, because he didn't send the stipulation back. So there wasn't a signed agreement by him.
Q. Was Mandarich still processing payments from Mr. Weinstein at this time?
A. Yes.

Page 74

Q. Had Mr. Weinstein missed any payments up to this point?
A. That I don't -- up to October?
Q. Yes.
A. I don't believe so. I don't have the ledger on me, but I don't believe so.
Q. What prompted, other than the fact that Mandarich believes that he -- strike that.
What prompted Mandarich to -- strike that too. I'm trying to balance the line here.
What is it that prompted Mandarich to review the file to make the determination that the case needed to be filed?
A. Okay. My understanding is, at the time, so we would have somebody review the file to determine if a stipulation had been returned. This individual I believe had reviewed the file on multiple occasions, requested that contact be made to revive it and get it back. And at some point in time, probably right before October, had communicated to the operations team that it has not been returned, and so now it needed to be reviewed for a lawsuit.
Q. Now, you said "it needed to be reviewed for a lawsuit."
A. Mm-hmm.

Page 75

Q. Was there already a lawsuit in place?
A. Actually I'm glad you said that. I'm sorry.
It needed to be reviewed for next step, which would have been filing of the lawsuit and default.
Q. So how do you know that these events occurred? And when I say "these events", I mean that somebody reviewed the file and then made these determinations.
A. The legal file that I mentioned earlier.
Q. Which department was it that was reviewing the case regarding the stipulation to make those determinations?
A. It would have been somebody in the operations department.
Q. And then when they believed that the lawsuit needed to be filed, who did they talk to?
A. They would have communicated to the responsible parties within the operations department, which would have been somebody different, to take the next step and then make sure that that documentation got to you.
Q. So ultimately the file got to you?
A. Yep.
Q. And what did you do when the file got to

Page 76

you?
A. What I would always do with the file; I'd review it, make a determination on whether we should proceed, and approve or deny.
Q. And did you make a determination to proceed on this case?
A. Yes, we did.
Q. And what did you determine was the next step necessary to proceed?
A. For purposes of the superior court, that we file a lawsuit and that you can default it.
Q. Were you aware, when you reviewed the file for the purposes of filing the complaint, that Mr. Weinstein had contacted Mandarich at some point in the past?
A. I believe so.
Q. Were you aware that he had contacted Mandarich in relation to receiving the lawsuit?
A. In relation to receiving the lawsuit. I can't say that I was.
Q. Is there any record that would indicate that he contacted Mandarich as a result of receiving the lawsuit?
A. Not that I'm aware. So you mean like the reason why he called was because he was served?

Page 77

Q. Right.
A. I don't recall there being any record that says that. But I do know that at the time I saw the lawsuit, he would have been making payments, which means he would have been in contact with us.
Q. Did you review the date of service when you reviewed the file in 2015 or later 2015 and made the determination to file the lawsuit?
A. I likely did, but I can't tell you yes or no. It would be normal that I would look for service.
Q. And what is your understanding of when a case begins in Washington?
A. Can you explain what you mean by "case begins"?
Q. What is the event that triggers a lawsuit in Washington?
A. Filing of the complaint.
I mean, I guess you're asking a different question. So district court, superior court, I'm not sure I understand.
Q. Well, for this particular lawsuit.
A. Well, when we generate a lawsuit and serve them, I mean the process starts. I don't know if you're saying if in the court system it starts when it's filed. I'm not sure of that which you're asking.

Q. Let me rephrase here. In Superior Court in Washington when does a case begin -- strike that. I'm trying to think of a way to phrase this. I think I'll come back to that.

When you reviewed the case prior to filing the lawsuit, you were aware that Mr. Weinstein had contacted Mandarich; correct?

A. I had reason to believe he would have, based on the fact that he would be making payments.

Q. And at the time that you reviewed, you were aware that he had entered into a payment plan with Mandarich?

A. I believe so. Again, this was three and a half years ago, so I can't specifically attest to what I recall at that time. I can only attest to what I would normally do in my procedure.

Q. At that time would the file that you reviewed have reflected that he entered into a payment plan?

A. It would have shown that he was making payments.

Q. And would the file have shown that he had made payments every month since entering into the payment arrangement?

A. It should have.

MR. SANTIAGO: Can we go off the record for a second.

(Off the record.)

Q. (By Mr. Santiago) So I think where I was, was at the time that you reviewed the case in 2015 would the file that you reviewed have reflected that he made payments every month since entering into the agreement?

A. It should have.

Q. What is the reason for the stipulation?

A. Can you be a little bit more specific?

Q. Well, so you mentioned that the reason you filed the case is because Mr. Weinstein didn't return the stipulation.

A. Yes.

Q. But you also testified that he had been making payments since first contacting Mandarich.

A. Yes.

Q. So if he had been making payments, why did you need the stipulation?

A. He stopped. That's the exact reason why I needed it.

Q. So in October of 2015 he had stopped making payments?

A. No, he stopped, I believe we said in March

of '16.

Q. Now, you said he stopped making payments. How did he stop making payments?

A. I don't know how he stopped making payments. I know that payments were no longer being processed; we believe that his card had expired. So when we tried to, I believe debit his card, it was showing as invalid.

Q. So --

A. Which means he stopped.

Q. Did you let him know that his card had expired?

A. We didn't know. We tried to contact him, but he wouldn't get back to us.

Q. Did you send him a letter about it?

A. I don't believe so. But I believe we made multiple phone calls to try to contact him.

Q. And you may have answered this already, but there is no recordings of those attempted calls?

A. Not that I'm aware of. We talked about earlier that the retention of some of that stuff is not in our possession or might not even exist anymore, so we have produced what we can get access to. But I can't attest to the fact whether they actually exist or not.

MS. STRICKLER: I can check for you.

MR. SANTIAGO: Sure.

Q. (By Mr. Santiago) And sorry to rehash this stuff again.

A. It's okay.

(Exhibit 8 marked for identification.)

MR. SANTIAGO: Nicole, this is the case schedule. And I'll just wait until Nicole says she's got it up.

MS. STRICKLER: I have it now. Thank you.

Q. (By Mr. Santiago) So looking at Exhibit 8, do you recognize that document?

A. Yes.

Q. What is it?

A. It looks like the case schedule for the underlying lawsuit that's subject to this matter.

Q. Did you send this document to Mr. Weinstein? And when I say "you", I mean Mandarich.

A. I believe so. When this gets filed, when the lawsuit gets filed, generally we get this and we're required to send it. But I'm not a hundred percent sure.

Q. Can I refer you to, I believe it's Exhibit 5. I'm not sure of the page, but if we can skip to Interrogatory 8.

Page 82

A. Okay. I see that.
Q. Does this refresh your memory about what Mandarich did?
A. Yes. So this is saying, yes, that we did serve a copy of the case schedule.
Q. When was that sent to Mr. Weinstein?
A. It says in March of 2016.
Q. So it had been five months since you filed the case when you sent him this schedule?
A. It's possible.
Q. Why do that?
A. I have no idea.
Q. And continuing to look at, in response to Interrogatory 8, that's Exhibit 5, page seven.
A. Got it.
Q. It says that you also sent a complaint to Mr. Weinstein; is that correct?
A. That's what this says.
MS. STRICKLER: Tyler, I notice on this case schedule a lot of the pages are -- can't really read them. Is it a bad scan?
MR. SANTIAGO: No.
Can we go off the record for a second.
(Recess 2:11 p.m. to 2:19 p.m.)
MR. SANTIAGO: Can you tell me where we

Page 83

were?
COURT REPORTER: "Question. It says that you also sent a complaint to Mr. Weinstein; is that correct?"
"Answer. That's what this says."
A. Yes, were talking about Interrogatory 8.
And I actually wanted to make a clarification on the interrogatory.
Q. (By Mr. Santiago) Sure.
A. So as I was reading this and you pointed it out, I don't believe that we sent anything in March of 2016. I believe this was an error in our response.
That we received this information from his counsel in March, but this was all sent to him back at the time that it was filed, the case management schedule.
I don't have any record to show that that was the case, but as I was reading it this definitely was in response to opposing counsel sending us the case schedule. So I'm not sure exactly why he sent it to us or whatever it was, but I wanted to clarify that. Because I think we need to amend this interrogatory.
Does that make sense?
Q. Okay. I understand.

Page 84

A. Because as I was reading it and you were pointing it out, I don't know why that would even happen five months later. It's likely that we sent it out at the time it happened, which is our process.
But for purposes of this response, we were communicated by, at the time plaintiff's counsel, and he submitted that case schedule directly to us.
Q. That's the same month that payments were unable to be processed; right?
A. Is it? Oh, yeah, okay.
MR. SANTIAGO: I need one minute to go print some documents.
(Off the record 2:20-2:26.)
(Exhibit 9 marked for identification.)
MR. SANTIAGO: Nicole, I'm going to enter as Exhibit 9, our responses to Mandarich's requests for admission. And I didn't email you a copy, but I assume you have it anyway.
MS. STRICKLER: I do. Plaintiff's objections and responses. Okay.
Q. (By Mr. Santiago) I have given you Exhibit 9. Do you recognize that document?
A. Yes.
Q. What is it?
A. It is Plaintiff's Responses to Defendant's

Page 85

First Requests for Admission.
Q. Can I have you turn to page four.
A. Okay.
Q. And on page four do you see number 13?
A. Number 13, yes.
Q. And it says "In March of 2016, You received a copy of the filed summons and complaint in the Lawsuit."
A. Yes.
Q. So this is you asking Mr. Weinstein to admit that he received a copy of the summons and complaint in March of 2016.
MS. STRICKLER: I'm just going to object at this point to where you're kind of crossing over to where Mr. Vos is acting as like defense counsel. This is a 30(b)(6) dep. He's answering on behalf of the corporation. So there is a distinguishing factor to be made here relative to that.
I just want to put that on the record that his answers will be just in his capacity as a 30(b)(6) representative, not as counsel.
MR. SANTIAGO: Sure.
Q. (By Mr. Santiago) So going back to number 13 --
A. Yes.

Q. -- Mandarich propounded discovery to Mr. Weinstein; is that correct?
A. Yes.
Q. And it asked for Mr. Weinstein to admit that in March of 2016, he received a copy of the filed summons and complaint in the lawsuit.
A. I see that.
Q. And number 14, which is on the next page, it asks Mr. Weinstein to admit that in March of 2016, he received a copy of the order setting case schedule in the lawsuit.
A. I see that, yes.
Q. So you testified earlier that the March 2016 date was incorrect.
A. I believe so.
Q. Why do you believe that?
A. I don't have a record to reflect that it was sent that way. I believe that it was based on the communication from opposing counsel, like I explained earlier.
Q. Why would Mandarich ask Mr. Weinstein to admit to receiving these documents?
MS. STRICKLER: Wait. I'm going to object. Don't answer that question, Ryan. That is like completely attorney-client privilege and like

litigation strategy work product. Don't answer that question.
MR. SANTIAGO: Just to explore this privilege issue, who has the privilege here? Who's the client and who's the attorney?
MS. STRICKLER: I'm sorry, what?
MR. SANTIAGO: Who is the client and who is the attorney in that privilege situation?
MS. STRICKLER: Well, Mandarich Law Group, LLP is the client. The attorney is Mr. Vos. And I'm not going to let you ask questions about why he, in his capacity as an attorney, asked plaintiff a particular question, because that does blur the lines between the two.
So you're asking for like an attorney strategy and why he asked plaintiff a particular question? That's not discoverable.
MR. SANTIAGO: Okay.
MS. STRICKLER: If we were talking about a question he asked in a state court case, I think you could make that argument. But to the effect that you're asking why he asked a question in the federal case, I don't think that's something that's discoverable. I think you're definitely into privilege there.

MR. SANTIAGO: Sure. I get what you're saying. So you're instructing Mr. Vos not to answer?
MS. STRICKLER: I am.
MR. SANTIAGO: Okay. So I'm not asking you what was said, but who is this communication to? When did it happen to create this privilege?
THE WITNESS: I'm sorry, are you asking me or Nicole?
MR. SANTIAGO: I'm asking Nicole, I'm sorry. So the privilege is being asserted --
MS. STRICKLER: You're asking for Mr. Vos's mental processes in drafting this request to admit to plaintiff. So it's work product in that you're asking for the attorney's strategy why they asked that particular question. So it is privileged.
Whether you want to say it's work product or you want to say it's attorney-client privileged, Mr. Vos talking to himself in this particular instance, I don't know, but I can tell you that it's definitely attorney strategy, and so it's not -- you can't ask him the reason why he drafted the requests for admission in this particular case.
MR. SANTIAGO: Okay.
MS. STRICKLER: Just like you wouldn't be able to depose me and ask me that question if I had

drafted.
Mr. Vos is here as a 30(b)(6) representative for the topics that are listed in the deposition notice, none of which are why you draft your requests to plaintiff.
MR. SANTIAGO: Okay. I understand what you're saying. And I wasn't trying to pry into it further, I just wanted to know who the attorney and the client was when the communication was made.
Privilege would be, you know, communication to an attorney for the purpose of legal advice.
So I'm just trying to figure out the circumstances surrounding it. I'm not trying to pry further into what it is, if that makes sense. So that we --
MS. STRICKLER: Okay. That's fine.
MR. SANTIAGO: I'll just move on, in any case.
MS. STRICKLER: Okay.
Q. (By Mr. Santiago) So your testimony today is that the information that you provided in your interrogatory responses, Mandarich Law Group when I say "you", Interrogatory No. 8 that you sent the complaint, the order setting case schedule, and the summons to Mr. Weinstein in March of 2016 is not

correct.
A. I don't believe that's correct.
Q. And it's based on what?
A. What's based on what?
Q. Your assertion that it's not correct is based on what?
A. That it's not correct.
Q. But what information?
A. I don't believe that happened.
Q. But why don't you believe that?
A. I don't need to give you a reason, I don't believe that happened is what I'm trying to say.
Q. But it was written in Mandarich's discovery responses. So I'm saying what changed your mind? What information made the answer change?
A. Based on the opposing counsel's communication in March, I believe that there was -- I believe that it was misconstrued as to how the communication was -- I guess how the documentation was given to -- or who it was given to.
So I am very well aware that opposing counsel sent Mandarich Law Group a case schedule in March, but for purposes of communicating to Mr. Weinstein, I don't believe that's accurate.
Q. When we started in this line of questioning

you asked for a break?
A. Yeah.
Q. Did you call anyone on your break?
A. I did.
Q. Who did you call?
A. I called Nicole.
Q. And when you say "Nicole", you mean?
A. Nicole Strickler.
Q. The attorney for Mandarich in this case?
A. Yes.
(Exhibit 10 marked for identification.)
MR. SANTIAGO: Nicole, Exhibit 10 is the Motion and Declaration for Default and Default Judgment, which I sent you yesterday.
MS. STRICKLER: The Motion and Order of Default?
MR. SANTIAGO: Yes.
MS. STRICKLER: Got it. Thank you.
Q. (By Mr. Santiago) So you have Exhibit 10.
A. Yes.
Q. Do you recognize that document?
A. Yes.
Q. What is it?
A. It's a Motion and Declaration for Default and Default Judgment.

Q. And what case was that document filed in?
A. For CACH versus Thomas Weinstein.
Q. And when was it filed?
A. October 13, 2015.
Q. Can I turn your attention to the section called Declaration?
A. Yes.
Q. Can I have you read that and just let me know when you're done?
A. The entire declaration?
Q. Yes.
A. Plaintiff --
Q. I'm sorry, you don't need to read it out loud. Sorry about that. Go ahead and just read it, and let me know when you're done.
MS. STRICKLER: Thank goodness.
A. I know what it says. Go ahead.
Q. (By Mr. Santiago) You say you know what it says?
A. Mm-hmm.
Q. That was fast. How do you know what it says so quickly?
A. So quickly?
Q. Yeah.
A. Because I wrote it.

Q. Do you draft a lot of these?
A. Yes. And it's standard language.
Q. So paragraph 3 --
A. Yes.
Q. -- says "Defendants have failed to file an appearance/answer or otherwise defend, in accordance with CR 55, within the time permitted by law."
Is that correct?
A. That's what it says, yes.
Q. And the last paragraph says, "I declare under penalty of perjury of the laws of the State of Washington that the foregoing is true and correct."
A. Yes.
Q. And the date on this is October 8, 2015?
A. Yes.
Q. And whose signature is that at the bottom?
A. It's mine.
Q. So when you filed this document, it was your understanding, after reviewing the file, that Mr. Weinstein had failed to answer or appear in the case?
A. That's right. He did not file an appearance and he did not answer.
Q. Did he appear in the case?
A. In the case?

Page 94

Q. Yeah.
A. No.
Q. Did not appear at all?
A. No.
Q. Now, this was filed on October 13, 2015 -- strike that.
So this was filed shortly after the complaint was filed with the court; is that correct?
A. Yes.
Q. Was he still making payments at this point?
A. Yes.
Q. Why file for a judgment if he was making payments?
A. As I've explained, he didn't return the stipulation. It was part of the requirement of the agreement.
Q. So if I can have you turn to page three.
A. Yes.
Q. Do you recognize that document?
A. Yes. Order of Default and Default Judgment.
Q. Did you sign this document?
A. Yes.
Q. So can I turn your attention to where it says Principal Amount?
A. Yes.

Page 95

Q. It's $3,028.05.
A. Yes.
Q. Is that the original amount that CACH and Mandarich were seeking when it first sent the lawsuit to Mr. Weinstein?
A. I believe so.
Q. And can we go down to Total?
A. Yes.
Q. Where it says $3,558.05?
A. Yes.
Q. Is that the total amount of judgment that Mandarich and CACH got in this case?
A. Yes.
Q. So above Total it says Credits.
A. Yes.
Q. And next to it it says zero dollars.
A. Yes.
Q. Is that accurate?
A. No.
Q. Why isn't it accurate?
A. It's a clerical error.
Q. Clerical error?
A. Yes.
Q. It's a clerical error, but what makes it not accurate?

Page 96

A. There were payments made.
Q. How much in payments were made?
A. I'm not sure how many payments were made.
Q. So you say there is a clerical error.
A. Yes.
Q. What was the clerical error?
A. The payments that were made would have been placed in the Credits section. So where it says zero, it should have had the total amount of payments, which would reduce the net total.
Q. And why were the credits not accounted for?
A. It was a clerical error.
Q. So who generates this document?
A. At the time the system Q-Law would have been generated, generated the document by a clerical staff, and then handed to me.
Q. So this was generated by a computer system.
A. Yes.
Q. What prompted it to be generated?
A. Well, we talked about that earlier. So there would have been a time frame that had passed, we would have reviewed the file. At this stage when we talked about it, one of the staff members had noticed that the stipulation hadn't been returned, despite efforts to try to get it to be returned, so we filed

Page 97

the lawsuit and generated the default.
Q. Before you signed off on this document, did you review the file?
A. Yes.
Q. And would the file have reflected payments?
A. Yes.
Q. So when you reviewed this document and signed it and filed it, you were aware that payments had been made.
A. Yep.
Q. Yet the document still reflects that none were made?
A. Yes, that's accurate. I review for payments. I'm sure I did review for payments. This was a simple clerical error. It was part of my process.
Q. Would it be fair to say there was more than one clerical error here?
A. It's possible.
Q. Well, I mean first the document was generated with zero; that would be a clerical error.
A. Yes.
Q. And then you reviewed it, and you did not notice that the payments were not credited?
A. Yes.

Q. Is that a clerical error as well?
A. It is, yeah.
We have policies in place to implement payments on our forms. In my review I review for payments. So, yes, I made a clerical error on this.
Q. What is it that populates the information on this document?
A. It would be the information that would have at the time been in Q-Law.
Q. So before it was even printed there would be data in Q-Law reflected -- strike that.
Before it was printed the data in Q-Law would reflect all of the principal and payments that were made.
A. Yes.
Q. So why didn't Q-Law populate credits with anything in this particular instance?
A. I don't know. That's the issue here. I really don't know.
I mean the way that the forms are generated, the fields and the data that they all pull from, these types of things happen. It's not often, but clerical errors do take place.
Q. So this has happened before?
A. In this file? No.

Q. In any other file?
A. Generally speaking is that we're not perfect.
Q. So is it fair to say that Mr. Weinstein did not owe $3,028.05 when this document was filed?
A. When the document was filed, I don't believe so.
(Exhibit 11 marked for identification.)
MR. SANTIAGO: Nicole, we're moving on to Exhibit 11, which is the first Writ of Garnishment from, I believe it's April.
MS. STRICKLER: April 2017. Got it.
Q. (By Mr. Santiago) So you have Exhibit 11. Do you recognize that document?
A. Yes.
Q. What is it?
A. Writ of Garnishment for Continuing Lien on Earnings.
Q. And let's turn to page three. Is that your signature?
A. Yes.
Q. So looking at page one, Balance of Judgment.
A. Yes.
Q. $3,558.05. Is that accurate?
A. That matches what the judgment was.

Q. Is that an accurate recollection of the actual balance?
A. For purposes of the writ, no. But it's netted out at the bottom in the total.
Q. And the interest that is there, what amount is that calculated on?
A. The interest under judgment for 10/13/15 to '17 would be on the judgment.
Q. Would be on the judgment.
A. Mm-hmm.
Q. So it would be on $3,558.05?
A. Yes.
Q. So at this point, on April 19, 2017, was Mr. Weinstein making payments?
A. No.
Q. And so this Payments net of costs applied, that reflects how much he had paid over the course of this payment plan with Mandarich?
A. Should have been.
Q. So you said that the interest was calculated on the full balance of the judgment?
A. Yes. That's how the writ works.
Q. Is it fair to say that there was more interest calculated than should have been?
A. It's possible. I haven't done the math.

Q. But in the universe of it being calculated on the $3,558.05, that would be too much because he actually had been making payments before the judgment; right?
A. If it wasn't given credit for, yes.
(Exhibit 12 marked for identification.)
Q. (By Mr. Santiago) Do you recognize this document?
A. Yes.
Q. What is it?
A. It is a Writ of Garnishment for Continuing Lien on Earnings. It appears to be a second one.
Q. This was filed October 20, 2017?
A. It was received by the payroll department, it looks like at Trader Joe's, yeah.
Q. So this was actually filed --
A. It would have been prior to that at some point.
Q. Right.
A. But I believe it was -- let's see. It was stamped by the court in October of '17.
Q. So looking at Balance of Judgment, $3,558.05, is that an accurate reflection of how much Mr. Weinstein owed?
A. No. We already talked about that.

Page 102

Q. Right. And the Interest under Judgment from 10/13/2015, which is the date that the judgment was entered, to the date that I guess this document was generated, September 14, 2017 --
A. Yes.
Q. -- is that calculated on the full judgment amount?
A. Yes, minus payments.
MR. SANTIAGO: Can we go off the record for a second.
(Off the record 2:49-2:50.)
(Exhibit 13 marked for identification.)
Q. (By Mr. Santiago) So you're looking at Exhibit 13. Do you recognize that document?
A. Yes.
Q. What is that?
A. This is Mandarich's Amended Affirmative Defenses.
Q. And so let's talk about on page two, Defense 1, which is the Bona Fide Error defense.
A. Yes.
Q. Paragraph 2 says "Any violation occurred despite the maintenance by Defendants of procedures reasonably adapted to avoid such error."
A. Okay.

Page 103

Q. What is the error?
A. Why don't you tell me.
Q. Well, you're asserting the defense, so I'm wondering what the error is that the defense applies to.
A. Specifically?
Q. Yeah.
A. Well, like I said, you're pleading, your client is pleading that there were errors. So are you being specific as to a particular situation? Because then I can speak to that.
Q. Well, essentially a bona fide error defense is an affirmative defense.
A. Yes.
Q. So a defendant asserting that would have to prove specific elements.
A. Okay.
Q. One of them would be that there was an error.
A. Okay.
Q. So if you're going to prove the affirmative defense, what are the errors that the defense applies to?
A. Well, I'm not necessarily saying there is any. But if you're referring to number 3, which it

Page 104

says "Specifically, relative to...Defendant's policy is to provide consumers with notice as required by CR 55."
Is that what you're referring to?
Q. We can talk about that. I'm just asking which errors occurred. You're asserting in your affirmative defense that an error occurred, so I'm just asking what they are.
A. Well, I'm not saying that an error did occur. I'm saying if you're pleading that an error occurred, and if it was specific to notice being provided for purposes of default, then we have a policy that addresses that.
Q. Okay.
A. And so therefore we have a bona fide error defense to that.
Q. So maybe going forward we can just assume that these are errors and --
A. Well, I'm not going to assume any errors. But we can address the fact that if there were an error, we believe that we have a policy that would alleviate from that, and that's why we pled the bona fide error.
Q. So if I understand what you're saying, you're saying that the bona fide error defense applies

Page 105

to some of plaintiff's claims.
A. It's possible.
Q. And part of the bona fide error defense is that an error occurred.
A. Okay.
MS. STRICKLER: Actually, I think perhaps just to assist with this, I think the problem is the way that the bona fide error defense is being described.
As we know, it's the plaintiff's burden to prove that there was a violation. If a violation is then proved, then the burden can shift to defendant to prove that it occurred despite the maintenance procedures that were adapted.
I know that we're all lawyers here, and whatnot, I think we talked about a couple of errors that have occurred throughout this particular scenario. Whether or not those are violations of the FDCPA, I think we can leave to a court to decide. But if we want to just talk about some of the errors that should not have occurred in this particular case, then put aside whether or not those constitute violations, I think perhaps we'll get a lot further and we won't be arguing with each other. Just a suggestion.
MR. SANTIAGO: I appreciate that. I

Page 106

disagree with you about how the affirmative defense works.

But for the purposes of moving on, we can just go through the errors that I think you kind of identified in this document.

Q. (By Mr. Santiago) Let's start with paragraph 3.

"Specifically, relative to 1692e, Defendant's policy is to provide consumers with notice as required by CR 55."

So is the error here the failure to give notice? Is that what this applies to?

A. That's what it would apply to. That's what I know that your client is suggesting.

Q. So let's say assuming a violation, that's what this defense applies to.

A. Yes.

Q. So that said, the policy of Mandarich is to provide consumers with notice.

A. Yes.

Q. Did it provide notice to Mr. Weinstein?

A. For purposes of this situation?

Q. Yes.

A. It did not provide notice, because there was no appearance.

Page 107

Q. And it might help if we actually just look at the complaint.

MR. SANTIAGO: Let's go off the record for a second.

(Off the record 2:57-2:58.)

(Exhibit 14 marked for identification.)

Q. (By Mr. Santiago) So you have Exhibit 14.

A. Yes.

Q. Do you know what that document is?

A. Yes. It's the plaintiff's complaint.

Q. So we can agree that the bona fide error defense applies to FDCPA claims?

A. Yes.

Q. So we'll only cover those in the complaint.

If I can turn your attention to page six, paragraph 36.a., it says that "Obtained a default when Mandarich failed to provide notice of the default motion to Plaintiff as required by CR 55, both because Mr. Weinstein had appeared in the case and because by the time Mandarich filed for default, it had been over one year."

Does Mandarich assert that the bona fide error defense applies to that claim?

A. In part. So this claim references both. So first we maintain that Mr. Weinstein did not appear,

Page 108

and therefore didn't merit notice originally. However, as it relates to it had been over one year, we do have a procedure in place to check for that, and that's what this affirmative defense addresses.

Q. What is the procedure?

A. To check to make sure it's not over a year.

Q. So if I understand what you're saying, your procedure is to not violate the rule?

A. The procedure is to check to ensure that it's not over a year.

Q. And --

A. We have a procedure that requires us to do that.

Q. What is the procedure?

A. To check.

Q. Well, who checks?

A. So the clerk will look and I will look.

Q. I'm sorry, this is the first time I'm hearing the term clerk. Who is the clerk?

A. The operation person that generated the document.

Q. I didn't understand, I'm sorry.

A. Yeah.

Q. So the clerk generates the document.

A. Yes.

Page 109

Q. Does the computer system check?

A. I'm not sure if that was built for the computer system in Q-Law. I'm not sure about that. But what I can tell you is is that I know I checked.

Q. So the procedure is the document is printed out.

A. Yes.

Q. The clerk looks it over to make sure.

A. Yes.

Q. Then you look it over.

A. Right.

Q. And after you look it over, it just goes out?

A. It would be rejected if it's incorrect, sure.

Q. And we can agree that this one was incorrect.

A. Right. Which is the whole purpose of the bona fide error.

Q. So if I understand you correctly, you're not asserting a bona fide error when it comes to the allegation that Mr. Weinstein appeared in the case.

A. We don't believe that he appeared in the case.

Q. So the bona fide error defense does not

apply to that particular claim.
A. It wouldn't need to, because he didn't appear.
Q. So you're not asserting it, is what I'm asking.
A. If he doesn't require an appearance, then you wouldn't need to assert it. If otherwise he would, then we would assert it. But we don't believe he does, so it doesn't need to be asserted.
Does that make sense?
Q. I understand what you're saying.
A. Mm-hmm.
Q. So you don't believe that it needs to be asserted; correct, and therefore it is not being asserted.
A. We don't believe it needs to be asserted in this circumstance, no.
Q. And are you asserting it in this circumstance?
A. If it were ruled that we had to have given notice for purposes of an appearance, we have a policy and procedure in place to give notice, so it would apply. But we don't need to assert it right now, because we don't believe that it's applicable.
Q. So there is the potential for you to attempt

to assert it later if you were to, say, lose that claim.
A. Okay.
Q. Is that what you're saying?
A. If it was ruled by the court or if you could show me a statute that says that you're supposed to provide notice when an appearance is made, because he made a phone call, then we have a policy in place that would ultimately -- currently that would ultimately provide for that notice.
Q. I appreciate that. But that wasn't my -- that didn't really respond to my question.
A. Okay.
Q. So what I'm asking is, are you asserting the bona fide error defense to the allegation that he had appeared in the case and --
A. No.
Q. -- required notice?
A. No.
Q. You're not asserting that.
A. No.
Q. Thank you.
So moving on to b., "Represented to the Court that Plaintiff had failed to defend or otherwise appear in the Collection Lawsuit when Defendant had

had contacts with Mr. Weinstein, including receiving payments from him."
Are you asserting the bona fide error defense to that claim?
A. No.
Q. C. "Obtained a default judgment despite Mr. Weinstein's appearance."
Are you asserting a bona fide error defense to that claim?
A. Again, if it relates to the appearance portion, no. It all goes to the same question that you asked. So the one year, yes.
Q. Are you asserting the bona fide error defense to letter d. "Obtained a default judgment based upon false and misleading representations"?
A. Generally speaking, false and misleading representations, if you're referring to balance not being given credit, yes.
Q. And what about -- strike that.
So what is the procedure in place to avoid the balance issue that you spoke of?
A. The balance issue?
Q. Yes.
A. So for purpose of credit.
Q. Right.

A. So as I mentioned earlier, similarly to reviewing for purposes of a year, similarly that that would be the same thing that would happen upon the review of the complaint and of the default; you would review for credits, ensure that it's properly allocated. So it would be in part of the review.
Q. So the procedure is to review the documents before they're filed to make sure they comply with the rules?
A. Yes.
Q. Is it fair to say you'd have to do that anyway?
A. Sure. The problem with that though is that you're just assuming it's being reviewed. So we have a process where you actually go through certain items to make sure that those particular items separately qualify.
Q. Tell me about the process.
A. That's what it is.
Q. Just to look.
A. Were payments made? Look at the system and make sure that that was the case. Where was service? When did that happen? Did the file go bankrupt? The file didn't go bankrupt. Are they deceased? There is no -- they haven't -- there is no deceased.

So there is different things that you might look at to determine, okay, should we proceed. You would like to think that all of those types of things might just happen in any given Sunday, but that's our policy and procedure to review for these things.

Q. Are you asserting the bona fide error defense to letter e., which is "Represented to Mr. Weinstein that they would take payments" -- they meaning Mandarich -- "to settle the case, but obtained judgment despite ongoing payments"?

A. I don't know if I fully understand the allegation.

MS. STRICKLER: Ryan, to the extent you don't know, you don't know. I mean you don't have a factual basis. You're not here to talk about legal strategy. So to the extent you have facts, go ahead and answer. To the extent you don't --

THE WITNESS: Okay.

Q. (By Mr. Santiago) So are you asserting the bona fide error defense to letter f. "Represented in a motion that Mr. Weinstein owed $3,028.05, despite the fact that he had already paid $1,470.77"?

A. Yes. It goes back to several of the other ones previously.

Q. And just so I'm clear, the procedure in

place to avoid this from happening is you check to make sure it's accurate.

A. Well, you check certain criteria to make sure that it's accurate, yes.

Q. And I'm sorry, just so I understand, what are the criteria?

A. Well, you just asked that and I just answered it. So now you want me to answer it again?

Q. This is a separate claim, so yeah.

A. Well, actually it isn't. You say it multiple different ways.

Ultimately speaking, you're claiming that we obtained a default that's false and misleading, which ultimately you're saying is that it was the wrong amount.

And then in f. you say it was the wrong amount.

So you're saying it multiple different ways.

So what I'm trying to say is that yes, we have a process in place where we check to see if payments were made. If payments were made, then credit should be given.

Once again, the same exact thing that I've said before.

Q. And are you asserting the bona fide error

defense to letter g., which states, "Represented in a motion that all payments had been credited to the alleged debt, when in fact no payments had been credited"?

A. Once again, same thing.

Q. And I understand that it's the same one, but --

A. Yes.

Q. -- I still have to go through them. I'm sorry.

A. Fair enough. Yes.

Q. Thank you.

And are you asserting the bona fide error defense to letter i., which is "Filed two writs of garnishment on a void judgment, and obtained funds from Mr. Weinstein's employer on a garnishment, even though the judgment was void"?

A. We don't agree that the judgment was void.

Q. So you're not asserting the bona fide error defense to that allegation?

A. I mean I don't believe so.

Q. So I'm going turn your attention back to the Amended Affirmative Defenses, I don't remember the number.

A. It's 13.

MS. STRICKLER: So we're back to the Amended Affirmative Defenses?

MR. SANTIAGO: Yes. We're done with the complaint for now.

A. And really quick, I just want to clarify.

Q. (By Mr. Santiago) Sure.

A. Whatever we've asserted in the bona fide error defenses is where we're applying our assertion, okay.

For example, I mean it says in number 8, "Defendant's policy is further only to take post-judgment collection efforts on valid judgments."

So I don't believe that it's -- I believe that it's a valid judgment, so that would apply in that way. You can ask it however you want to ask it, but ultimately we don't believe that it was an invalid judgment.

Does that make sense?

Q. Okay.

A. Assuming it was a valid judgment, that's what our policy is. We don't do post-judgment efforts on invalid judgments.

Q. Do you have a procedure in place to avoid that from happening?

A. Yes. We have a procedure in place to avoid

what from happening?
Q. The number 8 procedure to prevent taking post-judgment collection efforts on invalid judgments, I guess we would call it.
A. Well, yeah, that's our policy to only obtain judgments that would be valid.
Q. I'm sorry for stalling out here, I'm trying to avoid asking you legal questions, so just give me a second here.
A. Sure.
Q. Number 8 says your policy is to only take post-collection collection efforts on valid judgments.
A. Yes.
Q. Is there a procedure in place to prevent post-judgment collection on invalid judgments?
A. I mean for purposes of proceeding on a judgment, if a judgment is stamped court ordered, then we would proceed on a judgment unless made otherwise unknown, we don't know.
So if it's a judgment, and it's valid, and it's ordered by the court, then we would proceed on post-judgment.
MS. STRICKLER: Ryan, maybe this would help. Maybe if you can talk about your policies and procedures about how you determine whether or not you

undertake post-judgment collection efforts on a judgment, perhaps that would help answer Tyler's inquiries.
Would that be helpful, Tyler?
MR. SANTIAGO: Sure.
A. Okay.
MS. STRICKLER: Only if Tyler wants you to answer that.
Q. (By Mr. Santiago) Sure.
A. I mean okay. So if we obtain a judgment in a file, then before we were to review for any kind of post-judgment effort, we review to ensure that the judgment was obtained in the proper jurisdiction, that the judgment was for the amount it's supposed to be, that the asset was in the proper jurisdiction for purposes of Washington State law, and we'd execute accordingly.
Q. Would you check to see if there was valid service, for example?
A. On the underlying matter?
Q. Yes.
A. No. Valid service would be done prior to obtaining a judgment, not after judgment. So if you're now in the judgment stages, we've already checked for valid service; we won't check again for

valid service.
Q. So what do you do if judgment is in the incorrect amount? Because you mentioned you check to see if the amount is the correct amount.
A. I mean it depends on the circumstance and how we become aware of it.
Q. So is it fair to say that that happened in this case?
A. What happened?
Q. That the amount of the judgment was not correct?
A. Yes.
Q. So what did Mandarich do when it figured that out?
A. It gave credits on the writ.
Q. Did it move to modify the judgment or --
A. Amend?
Q. -- amend?
A. I don't have records to show that that happened.
Q. So I'm going to try to speed it up here, because I know you've got to --
A. Let me just check and see exactly what time it is.
MR. SANTIAGO: Let's go off the record for a

second.
(Off the record.)
Q. (By Mr. Santiago) Can I turn your attention to paragraph 9 of the bona fide error defense.
A. Yes.
Q. I understand that you may feel as if you've gone over this already, but I'm just going through each individual assertion.
A. Sure.
Q. Number 9, "If then, Defendant (as described in Plaintiff's complaint) made a misstatement to the court relative to Plaintiff's failure to defend or otherwise appear, or concerning the credits applicable to Plaintiff's account, such act was done despite the maintenance of procedures reasonably adapted to avoid any such error."
A. Yes.
Q. What are those procedures?
A. So we did talk already about the credits.
So we have our forms, first of all are supposed to pull the credits into the template. And they are all supposed to be reviewed before they are sent out for filing.
So for purposes of the credit component, we've talked about that a couple times, that's what

Page 122

happens there.

And then for purposes of notice, we would provide notice pursuant to Washington State rules. So there is a whole different process before you can actually default. There is a motion process. So we would do that instead.

Q. Who is it in your office that makes sure that your collection department complies with Washington law?

A. So I want to clarify because you mentioned collection department. Are you talking about the agents that are on the phones, or are you talking about the operations department that deals with the documentation?

Q. That's a good question. Actually I'm going to ask you about both.

A. Okay.

Q. In fact, thank you for clarifying, because I had forgotten that the operation department is the one that generates these documents.

So who is it that makes sure the operations department complies with Washington law?

A. Me.

Q. And what do you do to make sure that they comply with Washington law?

Page 123

A. They get training.

Q. We sort of talked about training before --

A. Mm-hmm.

Q. -- and you mentioned that the compliance department handles training.

A. Yes.

Q. So you work directly with the compliance department to train the operations department.

A. Yes and no. Sometimes I'll just train directly.

But ultimately speaking, to clarify, the operational department, they're not practicing law, they're not really doing anything that translates to legal decision making or anything of that sort. So it's not necessarily a Washington law issue. When that comes across my desk, that's my job.

Q. Earlier we talked about when the document is generated by a clerk. Is that somebody in the operations department?

A. Yes.

Q. So that person is supposed to check the balance and also check the dates before bringing it to you, yet they don't have any legal training?

A. Well, that has nothing to do with legal training. I mean that's a simple procedure that we

Page 124

put in place to say you need to look for X days.

Q. Is it fair to say that the procedure is based on the law?

A. Oh, yeah. Sure. But there is no interpretation happening at all.

Q. Are these policies and procedures written down?

A. Some are. I don't necessarily know if everything is written down.

MR. SANTIAGO: Nicole, is it possible to get whatever exists in discovery?

MS. STRICKLER: Yeah. Have some policies been produced?

MR. SANTIAGO: I don't believe so. All I have are letters.

I'm sorry, we can go off the record.

(Off the record 3:19 to 3:21.)

Q. (By Mr. Santiago) Going to Defense 3- Statute of Limitations, number 15. "Plaintiff complains of violations purportedly occurring more than one-year before the filing of his complaint."

I realize that you're here as a fact witness 30(b)(6), but do you know which particular claims are barred by one year statute of limitations?

A. I mean I couldn't recite them all off

Page 125

unfortunately.

Q. Fair enough.

MR. SANTIAGO: Let's go off the record.

(Recess 3:22 p.m. to 3:28 p.m.)

Q. (By Mr. Santiago) Just going back to the procedures that you have in place to prevent errors or FDCPA violations, you mentioned that the procedure for avoiding bad information in motions or -- sorry, you don't seem to like that word.

A. Would you mean like applying credits?

Q. Yes. So for example -- let me go back and start over.

So the procedure for making sure that credits are applied are, one, the computer should have had it done, two -- I'm sorry, is that correct, the first one?

A. Yes. The payments should be in the software program which should translate into the documents.

Q. Does anyone check the computer to make sure it's functioning properly?

A. There are reviews, there are general reviews that take place, but that would be aside and separate from, for example, actually going through and reviewing for a default. So it's completely separate.

Q. So step two would be the clerk in the

operations department would review it to make sure that it's accurate?
A. Yes.
Q. And three is you would review it for a Washington case.
A. Yes.
Q. So what happens when somebody violates those procedures?
A. Well, it depends on what violation we're talking about. So if we're specific to this particular situation, there would be retraining to ensure that those policies and procedures are being followed correctly.
And if it was something that would be chronic, you know -- and I'm not going to use this one as an example, because I'm not familiar with that, but let's say, for example, you have a collector that's not using a script or what have you and it happens multiple times, then we have a progressive program to ensure that they would do that.
Q. So when someone violates the procedure of checking the credits portion in a motion for default --
A. Yes.
Q. -- what happens? Because we sort of went

off on a tangent there on a different example, so I'm just being specific to this situation.
A. I mean specific to this similarly, so we would recognize it. In this particular situation it became aware several years later. To be honest with you I don't remember the specific clerk that did it, I don't know if they're even with us anymore, but if that was the case then we would retrain and ensure that those procedures are being followed as they should be.
Q. So you don't know which clerk did it?
A. Well, we do. Off the top of my head we don't. I know that we've responded with information on people that have worked with us, but I couldn't tell you off the top of my head.
Q. So did that person receive retraining?
A. Well, that's what I'm saying is I don't know. I have to go back and look.
MS. STRICKLER: I think I can get that information for you, Tyler. I'm happy to look into that. I know Ryan doesn't remember everything off the top of his head, but we can go back and look and get you the answer to that.
MR. SANTIAGO: Thanks.
MS. STRICKLER: Yeah.

Q. (By Mr. Santiago) So I guess my last question on that is did anyone actually violate the procedures here?
A. Did anyone violate the procedures?
Q. Yeah.
A. Well, I made an error by missing the credit for sure.
Q. Anyone else?
A. For purposes of the credits not going into the system, I mean it should have been reviewed so that the credits would have been applied, and that didn't take place.
Q. And with regard to the motion being filed over one year after service of the complaint?
A. Yeah, same issue.
Q. Similar, but --
A. Well, I'm sorry. Yeah. Similar circumstance, yes.
Q. In terms of what would happen if --
A. Yes, retraining.
Q. And do you know if anyone was retrained on that issue?
A. It would be the same person. So my answer would be the same as before.
Q. And then so the procedure that you have in

place, it was violated in a couple of ways?
A. Well, sure. I mean it was over a year and there was no credit applied.
Q. Did you get any retraining?
A. No.
MR. SANTIAGO: I don't think I have anything else, unless Nicole has something.
THE WITNESS: Nicole?
MS. STRICKLER: No, I don't have anything. Thank you for your hospitable time. I hope everyone has a happy Memorial Day Weekend.
We will reserve signature. I'll order an etran.
COURT REPORTER: Do you want a copy of the exhibits?
MS. STRICKLER: Yes, I'll take a copy of the exhibits too, just because I was looking at them on the computer.
(Signature reserved.)
(Deposition adjourned at 3:40 p.m.)

S I G N A T U R E

I declare under penalty of perjury under the laws of the State of Washington that I have read my within deposition, and the same is true and accurate, save and except for changes and/or corrections, if any, as indicated by me on the CHANGE SHEET flyleaf page hereof.

Signed in ____________________, Washington, this _________ day of __________________, 2018.

--------------------------------

RYAN VOS

Taken: Friday, May 25, 2018

Re: Weinstein v Mandarich
Cause No.: 2:17-cv-01897-RSM
Brenda Steinman, CCR.

C E R T I F I C A T E

STATE OF WASHINGTON )
) ss.
COUNTY OF KING )

I, the undersigned Washington Certified Court Reporter, hereby certify that the foregoing deposition upon oral examination of RYAN VOS was taken stenographically by me on May 25, 2018, and thereafter transcribed under my direction;

That the witness, before examination, was first duly sworn by me pursuant to RCW 5.28.010 to testify truthfully; that the transcript of the deposition is a full, true, and correct transcript to the best of my ability; and that I am neither attorney for, nor a relative or employee of, any of the parties to the action, or any attorney or counsel employed by the parties hereto, nor financially interested in its outcome.

I further certify that in accordance with CR 30(e), the witness was given the opportunity to examine, read, and sign the deposition, within 30 days, upon its completion and submission, unless waiver of signature was indicated in the record.

IN WITNESS WHEREOF, I have hereunto set my hand this date: June 2, 2018.

Brenda Steinman

---------------------------
Brenda Steinman, CCR #2717
License expires 10/15/2018

# EXHIBIT C

3. Defendant objects to each request to the extent it seeks information and/or documents subject to the attorney-client or work-product privileges.

4. Defendant objects to each request to the extent it seeks information and/or documents that are not in the possession, custody, or control of Defendant.

5. Defendant objects to each request to the extent it seeks information and/or documents that are neither relevant to disputed issues of fact or law, nor reasonably calculated to lead to the discovery of admissible evidence.

**RESPONSES TO REQUEST FOR ADMISSION**

**REQUEST FOR ADMISSION NO. 1:**

With respect to the Account, admit Plaintiff Thomas Weinstein is a "consumer" as defined by 15 U.S.C. §1692a(3).

**RESPONSE TO ADMISSION NO. 1:**

Defendant objects on the grounds that the request seeks an impermissible legal conclusion or interpretation. Subject to the foregoing objection and without waiving the same, Defendant states that after a reasonable inquiry, Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegation as it is not generally privy to the purposes for which persons, such as Plaintiff, incur their debts.

**REQUEST FOR ADMISSION NO. 2:**

With respect to the Account, admit that Plaintiff Thomas Weinstein is a "debtor" as defined by RCW 19.16.100(7).

**RESPONSE TO REQUEST FOR ADMISSION NO. 2:**

Admit.

**REQUEST FOR ADMISSION NO. 3:**

With respect to the Account, admit you are a debt collector as defined by 15 U.S.C. §1692a(6).

**RESPONSE TO REQUEST FOR ADMISSION NO. 3:**

Admit.

**REQUEST FOR ADMISSION NO. 4:**

With respect to the Account, admit you are a collection agency as defined by RCW 19.16.100(4).

**RESPONSE TO REQUEST FOR ADMISSION NO. 4:**

Admit.

DATED: March 2, 2018          **MANDARICH LAW GROUP, LLP**

By:   /s/ Ryan E. Vos
Ryan E. Vos
*Attorney for Mandarich Law Group, LLP*